**FOR PUBLICATION**

**UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

UNITED STATES OF AMERICA,

*Plaintiff - Appellee*,

v.

ANDRES SANCHEZ,

*Defendant - Appellant*.

No. 23-2533

D.C. No.
1:21-cr-00238-
BLW-1

OPINION

Appeal from the United States District Court
for the District of Idaho
B. Lynn Winmill, District Judge, Presiding

Argued and Submitted February 3, 2025
Portland, Oregon

Filed May 12, 2026

Before: Carlos T. Bea, Lucy H. Koh, and Jennifer Sung,
Circuit Judges.

Opinion by Judge Sung;
Partial Concurrence and Partial Dissent by Judge Bea

# SUMMARY[*]

## Criminal Law

The panel reversed the district court's denial of Andres Sanchez's motion for a new trial, and remanded for a new trial, in a case in which a jury convicted Sanchez on six counts of preparing and presenting false and fraudulent tax returns.

Sanchez argued that the presence of a racially biased juror during deliberations violated his Sixth Amendment right to trial by an impartial jury. It was undisputed that a racially biased juror was present during most of the jury deliberations and that this juror made racially biased comments during deliberations. The district court excused the biased juror and accepted the verdict from an 11-member jury.

The district court denied Sanchez's motion for mistrial before the verdict and his motion for new trial after the verdict. When determining whether Sanchez was prejudiced by the racially biased juror's presence, the district court applied the standard set forth in *United States v. Sarkisian*, 197 F.3d 966 (9th Cir. 1999)—whether other jurors' exposure to the biased juror's prejudicial comments so affected the jury's ability to consider the totality of the evidence fairly that it tainted the verdict. The district court concluded that the juror's comments did not taint the verdict.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel (1) held that the district court applied an incorrect legal standard; (2) rejected Sanchez's argument that the district court should have applied *Dyer v. Calderon*, 151 F.3d 970 (9th Cir. 1998) (en banc), under which the presence of a biased juror is structural error; and (3) held that when the presence of a racially biased juror is discovered or a juror is found to have made a racially biased statement, but the juror is excused before trial court accepts a verdict, the correct standard is the one set forth in *United States v. Remmer*, 347 U.S. 227 (1954), under which there is a heavy presumption of prejudice.

Applying the *Remmer* standard, the panel concluded that the Government did not effectively rebut the strong presumption and evidence that the racially biased juror's presence prejudiced Sanchez. Sanchez is therefore entitled to a new trial.

Judge Bea concurred with the majority's opinion that *Dyer v. Calderon*'s structural error standard does not apply but dissented from the majority's reversal of the district court's denial of Sanchez's motion for a new trial. He wrote that the majority (1) rejected this court's binding precedent in *Sarkisian* to conclude the district court applied an incorrect legal standard; (2) incorrectly extended *Remmer*'s presumption of prejudice to situations where, absent any outside contact to or from the jury itself, a racially biased juror participates in some jury deliberations but is removed from the jury following a report of misconduct by a juror to the judge and before the jury's final verdict is reached and the trial court accepts the verdict; and (3) created an insurmountable standard that the Government must satisfy to rebut the newly fabricated presumption of prejudice.

**COUNSEL**

Darci W. Crane (argued) and Sean M. Mazorol, Assistant United States Attorneys; Joshua D. Hurwit, United States Attorney; Office of the United States Attorney, United States Department of Justice, Boise, Idaho; for Plaintiff-Appellee.

Theodore B. Blank (argued), Law Office of Jeffrey Brownson, Boise, Idaho, for Defendant-Appellant.

**OPINION**

SUNG, Circuit Judge:

Defendant-Appellant Andres Sanchez appeals from his conviction on six counts of preparing and presenting false and fraudulent tax returns in violation of 26 U.S.C. § 7206(2). Sanchez argues that the presence of a racially biased juror during deliberations violated his Sixth Amendment right to trial by an impartial jury. It is undisputed that a racially biased juror was present during most of the jury deliberations and that this juror made racially biased comments during deliberations—but the district court excused the biased juror and accepted the verdict from an 11-member jury. The district court denied Sanchez's motion for mistrial before the verdict and his motion for new trial after the verdict. We conclude that the district court applied the incorrect legal standard when determining whether Sanchez was prejudiced by the racially biased juror's presence. Under the correct standard, there is a strong presumption of prejudice, and applying that standard, the Government has not met its heavy burden to

prove harmlessness.  Accordingly, we reverse the denial of Sanchez's motion for a new trial, and we remand for a new trial.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

Defendant Andres Sanchez, a person of Mexican descent, was employed at Fiesta Pro Services, a tax preparation business based in Boise, Idaho, which served Spanish-speaking clients.[1]  In September 2021, he was indicted on eight counts of aiding and assisting in preparing and presenting false and fraudulent tax returns in violation of 26 U.S.C. § 7206(2).  The district court granted the Government's motion to dismiss one count, and the case proceeded to trial on the remaining seven counts.

The case was submitted to the jury on the fourth day of trial, and the jury deliberated for four hours before recessing for the evening.  The next morning, the jury continued deliberating, and the court convened a session on the record with the parties.  The court first informed the parties that it had received a note from a juror asking how long the jury should continue deliberating if they were hung on a count, and the parties agreed to the court's proposed response.  The court then informed the parties that one of the jurors had communicated with the jury commissioner and a law clerk. The law clerk explained that a juror had asked to speak with them "'[b]ecause there is some stuff going on in the jury room, some racism I don't want to be a part of,' or something to that effect."  The court and counsel identified that juror as Juror 16.  After a short recess, the court stated for the record

---

[1] To the extent that this opinion reveals information under seal, we unseal such information for purposes of this opinion only.

that the jury had sent a note indicating that they had reached a verdict on some but not all counts, but that the parties and the court had agreed that the court needed to investigate Juror 16's allegation before accepting the jury's verdict.

The court brought in Juror 16. Juror 16 testified that earlier in the week, another juror had made a comment to the effect of, "Can you believe all those people like them gays down in California are coming up here?" Then, during deliberations, Juror 16 had a heated exchange with two other jurors, later determined to be Juror 1 and Juror 5. Juror 16 testified that, after he explained his verdict to the other jurors, Juror 1 became upset and accused him of not following the jury instructions. As Juror 1 was "getting done," Juror 5 said, "Yeah. And anyway, the Mexicans, all they want to do is screw us over anyway." Juror 16 responded, "So now we're racist too?" Juror 16 also explained that "it seemed like everybody had an attitude" against him for accusing another juror of being racist.[2] The court asked Juror 16 if he heard any other comments referencing ethnicity, and Juror 16 noted that earlier, the jury had discussed the fact that "there was nobody of color on the jury." The court then asked Juror 16 to leave the courtroom and retrieve the handwritten note he had tried to give to the jury commissioner that morning.

The court explained that, in its view, the jurors primarily had "a personality dispute," but it was also "quite clear that a racially motivated comment was made during deliberations

---

[2] The district court found, and the parties do not dispute, that Juror 5 made the comment about Mexicans. The district court did not make a clear finding about which juror made the comment about gay people, and it is not clear in the record whether it was Juror 5 or someone else. We do not need to resolve this factual issue to decide this appeal.

which the juror found to be offensive and troublesome." After conferring with counsel, the court decided to recess so it could research and reflect. During the recess, the court asked another judge to review Juror 16's handwritten note and redact portions that could reveal the jury's deliberative process and were unnecessary to the court's consideration of the jurors' potential bias. As redacted, the note says, in relevant part:

> Your honor and members of the prosecution and defense teams,
>
> I apologize for not writing this sooner. I have witnessed 2 separate instances at 2 separate times by 2 different juror[s], comments derisive and hurtful to the LGBTQ community and to the Spanish community. One of these special men went to the extreme of jumping up at his seat turned around yelling and flexing about how there is no way he will change his vote cuz "He will get off easy and F—ing do it again." After this rant directed at me, I said are you trying to bully me? [REDACTED] as this juror finished his rant. The other one jumps up and starts yelling "Yeah, Mexicans hate Americans and they will do anything to get over on us." He then went and rolled up his coat and laid down under a table.

Following the recess, the court informed counsel that it had reviewed the redacted version of Juror 16's note and determined that the note corroborated his testimony. Defense counsel formally moved for a mistrial. The district

court took the motion under advisement and decided to conduct a special voir dire to determine whether a racially biased statement was made, and if so, whether other jurors heard it or would be influenced by it.  The court brought the full jury into the courtroom, acknowledged they had reached at least a partial verdict earlier that morning, and apologized for making them wait.  The court explained that an issue arose, and it would need to question each juror individually.

The court started by questioning Juror 16 further.  At the court's request, Juror 16 confirmed his earlier testimony and described the juror who made the comment.  The court determined the juror described was likely Juror 5.  The court asked Juror 16 if the biased statement was "made under circumstances that other jurors could have heard it?"  He responded, "Absolutely."  At the court's request, Juror 16 described the three jurors most likely to have heard the comment.  The court determined those jurors were likely Juror 2, Juror 24, and Juror 25.  The prosecutor suggested, and the court agreed, to bring those jurors in next.

The court brought in Juror 24.  In relevant part, the voir dire went as follows:

> THE COURT:          Have you heard any comment by any other juror which might reflect some bias based upon race, ethnicity, national origin, or, I guess, any other kind of bias?
>
> JUROR 24:           No.

| | |
|---|---|
| THE COURT: | You haven't heard anything said during deliberations to that effect? |
| JUROR 24: | No. |
| THE COURT: | Okay. No reference to individuals from particular countries coming to this country or anything of that sort? |
| JUROR 24: | No. |

The court next brought in Juror 25 and asked the same initial question—whether they heard any comment which might reflect bias. Juror 25 responded, "Yes." The court asked Juror 25 to describe what was said and by whom, as exactly as they could recall. Juror 25 could only "roughly recall" and was not sure of the exact wording, but "[i]t was about the Mexican culture and more of how they act compared to Americans when they come over here[.]" The court then asked Juror 25 to describe "just as close as you can, word for word, what he said." Juror 25 responded, "When Mexicans come here, they act like they can't speak English to get away with certain things." The court asked if Juror 25 heard any other comments suggesting "some attitude about other individuals based upon national origin, race, or ethnicity," and Juror 25 said no. Like Juror 16, Juror 25 provided a description that indicated the person who made the comment about Mexicans was Juror 5. After excusing Juror 25, the court informed counsel that it needed to question all the remaining jurors because Juror 25's

testimony confirmed that the biased statement was made. The court then proceeded to ask each of the remaining nine jurors essentially the same initial question it had asked Juror 24 and Juror 25.[3]

Both Juror 33 and Juror 28 denied hearing any comment that could reflect racial bias but reported hearing an accusation of racism. And both believed Juror 16 had accused Juror 1 (not Juror 5) of being biased. Juror 28 also explained that other jurors reacted strongly to Juror 16's accusation of racism.

> JUROR 28:        Someone        said, "You're a racist," and then others chimed in and said, "Whoa. No, no. That's not the case."
>
>                  . . . .

---

[3] There were some minor variations in the form of the question. The court typically asked whether the juror "heard a comment which might reflect some bias based upon race, ethnicity, or national origin." The court asked two jurors more broadly whether they heard statements reflecting "any other kind of bias."

The court explained to Juror 33 that a comment that might reflect bias "doesn't have to be an expression where [the other juror] said, 'Yeah, I'm biased,' but just any statement that might reflect that attitude."

The court and counsel agreed that the court would ask some men who fit Juror 16's description of the juror who made the biased comment whether they "heard or made" a comment that might reflect bias, and the court asked seven jurors that question (Jurors 15, 12, 8, 5, 4, 2, and 1).

| | |
|---|---|
| THE COURT: | But you did not hear anything from any other juror that you would feel would justify someone saying that that's a racist comment? |
| JUROR 28: | Yeah. I didn't know why he said that. |
| THE COURT: | Okay. |
| JUROR 28: | Which was why we leapt to the defense of, "Whoa. Nobody is being racist." |

Juror 15 initially denied hearing any comment that could reflect racial bias, but upon further questioning, revealed that she heard a juror comment during deliberations that Sanchez's employer, Fiesta Pro Services, "could have come up from the cartel." Juror 15, however, explained that she believed the comment was not "a racist one" and "was more ignoran[t]" than derogatory.

| | |
|---|---|
| THE COURT: | So my question is: Have you heard any comment, or have you made any comment, but have you heard any comment by any other juror or a comment you may have made which |

|              |                                                                                                                                                                                                     |
| ------------ | --------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------- |
|              | might reflect some bias based upon race, ethnicity, or national origin? So by that I'm referring to any statement that a person – another person might take as reflecting some bias based upon one of those factors. |
| JUROR 15:    | No.                                                                                                                                                                                                  |
| THE COURT:   | You have not heard anything during jury deliberation that might reflect that?                                                                                                                        |
| JUROR 15:    | May I ask a question?                                                                                                                                                                                |
| THE COURT:   | You may.                                                                                                                                                                                             |
| JUROR 15:    | I have not heard anything regarding anyone in this courtroom or in the jury room, but I've heard some offhand – that I believe they were in jest – comments.                                         |
| THE COURT:   | Was it a comment made by another juror?                                                                                                                                                              |

JUROR 15:          Yes.

THE COURT:         Okay. Can you tell me what was said? Just as best as you recall word for word; and if not, get as close to word for word as you can.

                   . . . .

JUROR 15:          Okay. Um, I've heard – there was a comment. I think it was more ignorance than it was a derogatory comment, but somebody was – all of the sudden got on the subject – I don't know if it began from political discussion because there has been some political discussion. I don't think it was a racist one. But somebody started talking about, you know, the cartel, like, you know, cartels, you know.

THE COURT:         Was this during on [sic] a recess, or was it during jury deliberation?

JUROR 15:    It was during deliberation, but things had kind of broken down a little bit, and so they were discussing –

THE COURT:    What was the context why someone might have referred to a drug cartel? Do you recall why – I mean, I'm trying to figure out how that might have arisen and what might have been, I guess, the significance of that comment.

JUROR 15:    I think it was because of the – of the name of the company that is – that is, I guess, not on trial, but –

THE COURT:    Yeah.

JUROR 15:    – the name of the company that we have been discussing. And so somebody said something like, "You don't know how deep things run," you know. "You know, I'm from

[REDACTED] or I've spent time in [REDACTED], and, you know, it could have come up from the cartel," which I kind of said, "Are you serious? I mean, come on."

. . . .

THE COURT:      Was any comment made – let me see if I can – how I might phrase this. Was there any comment about how people of a certain race, ethnicity, or national origin might behave or anything like that, or was it just this drug cartel?

JUROR 15:       That was the only one I heard because it was kind of directed down towards my side of the table.

After further questioning, Juror 15 also reported hearing at least part of the exchange Juror 16 reported, which she described as follows:

> I heard this morning there was a comment. There was – we were discussing and all of that, and one of the jurors said something to one of the other jurors, "Well, at least I'm not racist." And that was kind of shut down right away. One of the women said, "That's really uncalled for[.]"

Juror 15, like others, believed Juror 16 had accused Juror 1 of racism.[4]

Juror 12 also initially denied hearing any comment that might reflect racial bias. Upon further questioning, however, Juror 12 revealed hearing a comment about Mexicans.

> THE COURT:            My question is: Have you heard or made any comment during jury – well, during the trial and specifically during the jury's deliberations which might reflect some bias based upon race,

---

[4] After Juror 15 explained she believed that Juror 5 made the cartel comment "in jest," the court specifically directed the next five jurors—Juror 12, Juror 8, Juror 5, Juror 4, and Juror 2—to report comments that might reflect bias even if they thought the "statement was made in jest" or "not made seriously."

ethnicity, or national origin?

JUROR 12:    No, I have not.

THE COURT:   Okay. And by that, I mean even if you don't think they were serious, even if you thought it was made in jest, even if you thought that it was just a random comment, I need to know, even if you thought they were not serious and, in fact, were not biased in any way. Was there any comment made that a person might suggest was a reflection of some bias?

JUROR 12:    I don't believe that there was anything said that was biased. There was comments that I heard about – how do I put this? – like, how the Hispanic community kind of pulls together for themselves, but I didn't take that as any

|              | – anything biased at all. |
|--------------|---------------------------|
| THE COURT:   | Okay. Any other comments along those lines referring to Hispanic community, being from Mexico, anything of that sort? |
| JUROR 12:    | Nothing that sticks in my – nothing that I really recall – |

When the court asked Juror 8 if they heard a comment that might be perceived as reflecting racial, ethnic, or national origin bias, Juror 8 responded, "yes." But the comment Juror 8 perceived as biased was Juror 16's statement, "Well, at least I'm not racist." Juror 8 also believed Juror 16's accusation was directed at Juror 1. Juror 8 explained that they responded to Juror 16's statement by saying, "That is not acceptable." The court asked, "It's not acceptable to be racist or not acceptable to . . . accuse?" Juror 8 responded, "To accuse someone." Juror 8 also explained that, in their view, Juror 1 "was just giving his opinion on how he felt about the evidence."

Next, the court questioned Juror 5. At this point in the special voir dire, the court had reason to believe that Juror 5 had made the biased statement that Juror 16, Juror 25, and Juror 12 had reported. The court asked Juror 5 whether he had heard or made any comment which might reflect some bias—even if made in jest. Juror 5 responded, "No." After asking Juror 5 to step out, the court asked the prosecutor whether she would like the court to ask any follow-up

questions, and she declined.  The court then explained that it "could specifically ask [Juror 5] whether he made that statement," but it was concerned about "how this questioning may affect the jury," even though "the fact that [the jurors] have indicated they have already reached a verdict and are no longer deliberating [meant] maybe that [this questioning] won't affect that."  It was also skeptical that "trying to pin [Juror 5] down" would "cause him to, all of a sudden, reveal something he said."  Counsel for Sanchez agreed that the court did not need to question Juror 5 further.

The court questioned the remaining three jurors in much the same manner.  Juror 4 did not report hearing any comment that might be biased.  When the court asked Juror 2 whether he heard a potentially biased comment, Juror 2 responded that he heard the word "racist" thrown out but he "didn't know what was going on."

The court questioned Juror 1 last.  At this point, the court and counsel believed that Juror 1 was most likely the juror who had argued with Juror 16 about Juror 16's verdict. When the court asked Juror 1 if he heard any comment that might indicate bias, Juror 1 responded, "yes," but reported only Juror 16's comment, "You're a racist."[5]  Juror 1 said he believed the accusation of racism was directed at himself. The court asked Juror 1 whether he heard "anyone else, maybe in the response to that exchange or at any other time, make any comment in which the word 'Hispanic,' 'Spanish,' 'Mexican,' 'from Mexico,' anything like that" was said.

---

[5] After asking Juror 1 whether he had heard or made any comment which could indicate bias based on race, ethnicity, or national origin, the district court added, "And you'll note I said it might be perceived.  I'm not asking whether someone made or, in fact, is biased, but whether they made any statement that a person might perceive in that way."

Juror 1 responded, "No."  After directing Juror 1 to step out, the court asked counsel if there were other questions the court should ask him.

Defense counsel requested that the court ask Juror 1 specifically "if he heard or said, 'When Mexicans come here, they act like they can't speak English to get away with things.'"  The prosecutor objected and argued it was unnecessary.  The court noted that it seemed Juror 5 made the comment about Mexicans during "a three-way communication of sorts" involving Juror 16, Juror 1, and Juror 5, but that two people, Juror 16 and Juror 25, attributed the comment to Juror 5.  The prosecutor continued to object to asking Juror 1 the question defense counsel proposed and argued that the question had essentially been asked and answered; that "specifically inquiring further tends to suggest that we don't believe his response"; and that she did not "think anyone [had] accused Juror No. 1 of saying anything racist, only that he was called racist."  The court said it would take a recess and review the transcript before deciding whether to question Juror 1 further, and it ultimately decided against doing so.

During the special voir dire, whenever a juror reported hearing a potentially biased comment or accusation of bias, the district court asked the juror whether the comment or accusation they heard affected their individual verdict. [6] Each juror essentially responded "no."

Following the recess, counsel for Sanchez renewed his motion for mistrial.  The prosecutor opposed and argued that the court should instead excuse Juror 5 under Federal Rule of Criminal Procedure 23(c) and proceed with eleven jurors.

---

[6] The court did not ask Juror 16 this question.

The court ruled there were not grounds for mistrial, but that it would excuse Juror 5 for good cause. The court denied the motion for mistrial because "all of the jurors have unequivocally expressed their view that they were not affected by any statement or any accusation of discrimination [and] that they do not believe that their individual verdict or the verdict of other jurors except perhaps Juror No. 5 would have been affected by any statement or accusation of racism made during the jury's deliberations." The court added that it would have granted the motion "[i]f any juror had expressed concerns about how it might impact their deliberation," but did not because "they, if anything . . . were sensitive to accusations of racism." "[F]or that reason, [the court was] very confident that the remaining jurors did not and would not let any racial animus or national origin animus affect their verdict."**[7]**

The court then explained why it would dismiss Juror 5 for good cause under Rule 23(b)(3). In its view, the dispositive question was: "Will a juror be able to deliberate impartially?" The court explained, "I think it's possible Juror 5 could do so, but I'm not willing to take that chance. Here, I'm going to dismiss Juror 5 because I have determined that he cannot be fair and impartial." The court also made several material findings. It found that Juror 16 heard a comment made to the jury that reflects "clearly at least a national origin bias, if not racial and ethnic bias" and

---

[7] The court later addressed why it concluded that Juror 5 "must be dismissed" even though it "did not ask Juror No. 5 whether he could be fair and impartial." The court doubted asking that question "really would make any difference" because, "even if [Juror 5] said he could" be fair and impartial, the court did not think it "could accept that [response] given the statements he made in a more unguarded moment during jury deliberations, as overheard by Juror[s] 16 and 25."

that the statement Juror 16 heard was to the effect of: "people from Mexico come to the United States to screw over or get over on Americans." It also found that Juror 25 heard a statement about how people from Mexico "act compared to Americans when they come to the United States." The court found that Juror 5, not Juror 1, made the biased statement about Mexicans. It based this finding on several factors, including the other jurors' descriptions and Juror 5's demeanor during the special voir dire.**[8]**

Finally, the court explained that it believed the Federal Rules of Criminal Procedure gave it three options, (1) declare a mistrial, (2) proceed with 11 jurors, or (3) seat an alternate juror in place of Juror 5, and that it would exercise its discretion to proceed with 11 jurors. The court had already rejected declaring a mistrial, and it expressed various concerns about seating an alternate. An alternate might not have followed the court's admonition not to discuss the case with anyone else and would not be able to

---

[8] As the court described:

> Juror No. 5 was the only juror who reacted negatively to my inquiry. It was very clear that he felt that I was accusing him of something, although I think my questioning of him was no different from any other juror. And he left the courtroom while I was still trying to instruct him, and, essentially, I don't think it's too much of an overstatement to say that he kind of charged out of the courtroom.

> All of that added together makes me conclude that he made a statement that demonstrated animus based upon national origin or ethnicity. And for that reason, he cannot and his verdict – he should not – his verdict should not be received or his vote should not be made part of the jury's conclusion in this case.

participate. And, even if the alternate had followed the court's admonition, the court "would have to instruct the entire jury to start the entire process over, which obviously would not start until next week." In the court's view, requiring the jury to start deliberations over "would not be either prudent, fair, or necessary in the interest of justice, given the fact that the jury deliberated for all of yesterday afternoon and into this morning and, other than this one unfortunate incident with Juror No. 5, was ready to return a verdict."

The court called the jury back in, excused Juror 5, and instructed the remaining 11 jurors to resume deliberations. It did not direct them to begin deliberations anew or to disregard any comments by Juror 5. Rather, it instructed them: "you should consider [] whether excusing Juror No. 5 and functioning as a jury of 11, whether you have reached a different verdict or would reach a different verdict."**[9]** After

---

[9] The court instructed, in full:

> Ladies and gentlemen, for the rest of you, I'm mindful that you advised us this morning that you have a partial verdict to return. However, now things have changed somewhat because there is now 11 of you. I actually have discretion to allow you to resume deliberations as a jury of 11 rather than 12, and I have exercised that discretion to authorize you now to return to the jury room.
>
> And in reality, the thing you should consider is whether excusing Juror No. 5 and functioning as a jury of 11, whether you have reached a different verdict or would reach a different verdict. That's up to you to decide.
>
> So I will ask you to go back to the jury room and advise the bailiff if and when you have reached a

directing the jury to "resume [their] deliberations," the court told counsel: "[D]on't go very far. I rather suspect we will have a verdict very shortly, but perhaps not." The court also explained the inquiry it would undertake "if the jury returns a partial verdict, which is, I think is, what we thought they had done this morning." As the court predicted, the jurors resumed deliberations for only thirteen minutes and returned a partial verdict.

Sanchez subsequently filed a motion for a new trial, contending that Juror 5's presence violated his Sixth Amendment right to a trial by an impartial jury. Sanchez argued primarily that the presence of a racially biased juror during virtually all of the deliberations amounted to structural error requiring a new trial under *Dyer v. Calderon*, 151 F.3d 970, 973 n.2 (9th Cir. 1998) (en banc). Sanchez alternatively argued that, even if there was no structural error, the record established Juror 5's participation tainted the jury's deliberations and verdict, and that Rule 23 of the Federal Rules of Criminal Procedure authorized the trial court to proceed with an eleven-member jury only when a juror is excused for unavailability, not racial bias.

In response, the Government primarily argued that there was no structural error under *Dyer* because "there was no

unanimous verdict on all counts, or concluded that you're unable to reach a verdict on any count, or if you've concluded that you can reach a unanimous verdict on some but not all and you are unable to reach a verdict on the remaining counts.

So it's really up to you now to go back to the jury room. And as soon as you advise the bailiff as to your verdict or whether you still have a verdict, then you can so advise us, and we will return you into court and receive your verdict in that way.

biased juror that returned a verdict in this case." The Government argued that *United States v. Sarkisian*, 197 F.3d 966, 973–75 (9th Cir. 1999), was more comparable to this case than *Dyer*, and that *Sarkisian* supplied the correct standard for assessing prejudice. The Government further argued that, applying *Sarkisian*, the district court correctly determined that Juror 5's presence on the jury did not prejudice Sanchez.

The district court denied Sanchez's motion for a new trial. It adopted "with some reservation" the Government's position that "Juror 5's involvement in the deliberations alone is not enough to warrant a new trial." *United States v. Sanchez*, 692 F. Supp. 3d 1025, 1030 (D. Idaho 2023). Quoting *Sarkisian*, 197 F.3d at 981, the district court determined that "the proper question here is whether Juror 5's comments 'so affected the jury's ability to consider the totality of the evidence fairly that it tainted the verdict.'" *Sanchez*, 692 F. Supp. 3d at 1033. The court concluded that Juror 5's comments did not taint the verdict because (1) "the majority of the jury . . . informed the Court that it had no awareness of Juror 5's comments nor did they hear any other comments that they believed demonstrated bias or racial insensitivity during deliberations"; and (2) "[o]f the jurors who did hear any of the concerning comments, the Court directly inquired whether those comments affected the juror's deliberations or verdict," and "[i]n response, each juror unambiguously informed the Court that those comments did not affect their deliberations or individual verdicts." *Id.* at 1033–34.

## II.   STANDARD OF REVIEW

"We review a district court's . . . denial of a new trial on the assertion of juror misconduct or bias for abuse of

discretion . . . ." *United States v. Smith*, 424 F.3d 992, 1011 (9th Cir. 2005).[10] In this Circuit, we have adopted "a two-part test to determine objectively whether a district court has abused its discretion in denying a motion for a new trial." *United States v. Hinkson*, 585 F.3d 1247, 1261 (9th Cir. 2009) (en banc). "The first step . . . is to determine de novo whether the trial court identified the correct legal rule to apply to the relief requested." *Id.* at 1261–62. "If the trial court failed to do so, we must conclude it abused its discretion." *Id.* at 1262. "If the trial court identified the correct legal rule, we move to the second step . . . ." *Id.* "[T]he second step of our abuse of discretion test is to determine whether the trial court's application of the correct legal standard was (1) 'illogical,' (2) 'implausible,' or (3) without 'support in inferences that may be drawn from the facts in the record.'" *Id.* (quoting *Anderson v. City of Bessemer*, 470 U.S. 564, 577 (1985)). "A district court abuses its discretion where it . . . relies on an improper factor, omits a substantial factor, or engages in a clear error of judgment . . . ." *Senne v. Kan. City Royals Baseball Corp.*, 934 F.3d 918, 926 (9th Cir. 2019).

## III.  DISCUSSION

The Constitution requires "a jury capable and willing to decide the case solely on the evidence before it." *Smith v. Phillips*, 455 U.S. 209, 217 (1982). The Sixth Amendment guarantees criminal defendants the right to a trial "by an impartial jury." *Duncan v. Louisiana*, 391 U.S. 145, 153

---

[10] Sanchez also appeals from the denial of his motion for mistrial, which we also review for abuse of discretion. *United States v. Lemus*, 847 F.3d 1016, 1024 (9th Cir. 2016). Because the standard of review is the same, and Sanchez's motions for a mistrial and new trial present the same issues, we refer only to the motion for new trial.

(1968) (quoting U.S. Const. amend. VI). "The bias or prejudice of even a single juror" violates that right. *Dyer v. Calderon*, 151 F.3d 970, 973 (9th Cir. 1998) (en banc). "Actual bias is, in essence, . . . the existence of a state of mind that leads to an inference that the person will not act with entire impartiality." *United States v. Mitchell*, 568 F.3d 1147, 1151 (9th Cir. 2009) (citation modified).

The key facts underlying Sanchez's Sixth Amendment claim are essentially undisputed. Sanchez contends, and the Government does not meaningfully dispute, that a racially biased juror, Juror 5, was present during virtually all the jury's deliberations—but excused before the district court accepted the jury's verdict. Further, the Government does not challenge the district court's finding that Juror 5 made a statement during jury deliberations to the effect that "people from Mexico come to the United States to screw over or get over on Americans." Nor does the Government challenge the district court's finding that Juror 5 could not "be fair and impartial."

The district court concluded that Juror 5's statement "demonstrated animus based upon national origin or ethnicity." On appeal, Sanchez contends that the district court erred by not recognizing that Juror 5's statement demonstrated "racial bias." [11] Because the Government

---

[11] The district court found that Juror 5 made a statement that demonstrated bias based on national origin or ethnicity when it ruled on Sanchez's motion for a mistrial. However, in the court's subsequent order denying Sanchez's motion for a new trial, it stated that it would only "assume" for the purposes of the motion that Juror 5's "comments were sufficient to demonstrate actual bias," while noting that it "seem[ed] likely that the Court would have found that Juror 5's statements did, in fact, demonstrate racial bias." Because the parties agree that Juror 5 made a racially biased statement, we need not address

concedes that the statement was racially biased, we do not
need to decide whether the district court erred.  Still, we note
that the Supreme Court has characterized similar comments
about "Mexican men" as racially biased.  *See Peña-
Rodriguez v. Colorado*, 580 U.S. 206, 214–15 (2017) ("[The
juror's] bias was based on petitioner's Hispanic identity,"
and "[t]his opinion refers to the nature of the bias as racial in
keeping with the primary terminology . . . used in our
precedents.").

On appeal, the parties focus their dispute on whether the
district court abused its discretion by applying the wrong
legal standard for assessing prejudice when a racially biased
juror was present during deliberations but excused before the
court accepts the jury's verdict.  As noted, the district court
concluded that *Sarkisian* supplies the applicable standard,
and consequently, it defined the issue as "whether other
jurors' exposure to the [biased juror's] prejudicial comments
'so affected the jury's ability to consider the totality of the
evidence fairly that it tainted the verdict.'"  *Sanchez*, 692 F.
Supp. 3d at 1032 (quoting *Sarkisian*, 197 F.3d at 981).

The Government contends that the district court
correctly applied *Sarkisian*.  Sanchez argues that the district
court should have applied *Dyer v. Calderon*, under which
"[t]he presence of a biased juror" is structural error.  151
F.3d at 973 n.2.  Alternatively, Sanchez argues that the
district court should have applied *United States v. Remmer*,
under which there is a heavy presumption of prejudice, and

---

whether the district court correctly viewed racial bias as meaningfully
different from ethnic or national origin bias under the circumstances of
this case.

the Government bears the burden of rebutting that presumption.  347 U.S. 227, 229 (1954).

For the reasons discussed below, we conclude that the *Remmer* presumption-of-prejudice standard applies where, as here, a biased juror was present on the jury but excused before the verdict was accepted.  Applying that standard, the Government has not met its burden to rebut the presumption of prejudice, and Sanchez is entitled to a new trial.

## A.

We begin by addressing the Government's argument that the district court correctly applied *Sarkisian* instead of *Remmer*.

In *Remmer*, the defendant learned for the first time post-verdict that, during trial, an unknown person had approached the jury foreman and told him that he could profit by acquitting the defendant.  347 U.S. at 228.  In a motion for a new trial, the defendant requested a hearing to determine the circumstances surrounding the incident and its effect on the jury.  *Id.*  The district court denied the motion without a hearing, and the court of appeals held that the district court had not abused its discretion because the defendant had not shown prejudice.  *Id.* at 229.  The Supreme Court reversed and held:

> In a criminal case, any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial, if not made in pursuance of known rules of the court and the instructions and directions of the court made

during the trial, with full knowledge of the parties. The presumption is not conclusive, but the burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant.

*Id*.

In *Sarkisian*, the juror-taint issue arose during trial but before the jury began deliberations, and the alleged taint came from within the jury, not an external source. 197 F.3d at 980–81. A juror named Angela Yerkes informed the court "that she had a problem." *Id.* at 980. In a meeting with the trial judge, in which no other jurors were present, she made a "prejudicial statement against 'gypsies,'" *id.*, a derogatory term used to refer to persons of the Roma ethnic group. Notably, none of the defendants were Romani. *Id.* at 981. The court excused Yerkes and then met with each juror individually. *Id.* at 980. Through the special voir dire, the district court found, in relevant part, that Yerkes only vaguely referred to "gypsies" when talking with two other jurors. *Id.* at 980 & n.4. On appeal, the defendants argued that "the district court erred in denying their motion for a mistrial because the jury was tainted by Juror Angela Yerkes's prejudicial statement against 'gypsies.'" *Id.* at 980. We characterized the issue before this court as "whether the jurors' exposure to Juror Yerkes's comments about gypsies 'so affected the jury's ability to consider the totality of the evidence fairly that it tainted the verdict.'" *Id.* at 981 (quoting *United States v. Smith,* 962 F.2d 923, 935 (9th Cir. 1992)). Applying that standard, we concluded that the district court properly found that Yerkes's presence on the jury did not prejudice defendants. *Id.* at 982. But we also

noted that it was "unclear whether *Remmer* applies" and concluded in the alternative that "even if *Remmer* applies, . . . the Government adequately demonstrated that the jury's exposure to Yerkes's conduct was harmless." *Id.* at 981 n.5. Thus, in *Sarkisian*, we did not decide the standard that applies when a biased juror is present or when a juror makes biased comments to other jurors. Nor did we hold that *Remmer* is inapplicable.

The Government acknowledges that *Sarkisian* did not decide whether *Remmer* applies but argues we should adopt its alternative standard.[12] We decline to do so because

---

[12] The Dissent wrongly asserts that *Sarkisian* is binding precedent and then accuses us of ignoring it. Dissent at 52, 63–64. As explained above—and as the Government concedes—in *Sarkisian,* we questioned whether *Remmer* supplies the legal standard for a case involving a racially biased juror dismissed before the district court accepted a verdict, but we left that possibility open and applied *Remmer* in the alternative. In other words, *Sarkisian* did not squarely decide that *Remmer* does *not* apply in such cases. "Prior precedent that does not 'squarely address' a particular issue does not bind later panels on the question." *United States v. Kirilyuk*, 29 F.4th 1128, 1134 (9th Cir. 2022) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 631 (1993)). Confusingly, the Dissent asserts that "*Sarkisian* did not apply *Remmer*'s presumption of prejudice under circumstances similar to Sanchez's case." Dissent at 63-64. If the Dissent is asserting that we did not alternatively apply the *Remmer* standard in *Sarkisian*, that is demonstrably incorrect: We expressly stated, "even if *Remmer* applies, . . . the Government adequately demonstrated that the jury's exposure to Yerkes's conduct was harmless." *Sarkisian*, 197 F.3d at 981 n.5. This is an application of the *Remmer* standard which requires the Government to prove harmlessness. If the Dissent is asserting that this alternative application of *Remmer* in *Sarkisian* is irrelevant because the factual circumstances are dissimilar to Sanchez's case, that assertion cannot be reconciled with the Dissent's contention that *Sarkisian* is controlling here because the factual circumstances are similar. Dissent

*Sarkisian*'s reasoning is unpersuasive.  First, it is inconsistent with prior precedent, *United States v. Shapiro*, 669 F.2d 593 (9th Cir. 1982).  *Sarkisian* questioned *Remmer*'s applicability only "because *Remmer* involved an *ex parte* communication between a juror and an outside person, whereas [*Sarkisian*] involved an allegation that the jurors were exposed to the bias of one juror" who was removed before deliberations.  197 F.3d at 981 n.5.  But we had already held in *Shapiro* that *Remmer* applies when the "jury taint originates from within the jury itself"—including when the alleged taint arises from jurors' exposure to the partiality of another juror who was removed before deliberations.  *Shapiro*, 669 F.2d at 599–600, 603 (applying *Remmer* where juror "Leoni" had attempted to extort the defendant because of "the possibility that before his removal, [Leoni had] attempted to influence other jurors").

Second, the standard we articulated in *Sarkisian* as an alternative to *Remmer* was a quote from *Smith*, 962 F.2d at 935—and that quote was an articulation of the plain error standard in a case that had nothing to do with juror bias or misconduct.  In *Smith*, the defendant contended that his conviction should be set aside because "the prosecutor's closing remarks constituted improper prosecutorial vouching," but defense counsel had failed to raise a contemporaneous objection to the prosecutor's conduct.  962 F.2d at 933.  Thus, after we determined that the prosecutor's closing statements were improper, we needed to assess whether the prosecutor's "statements were sufficiently

---

at 61 (arguing that "*Sarkisian* and *Sanchez* are not factually distinguishable").

egregious to amount to plain error." *Id.* at 935.[13] After describing the plain error standard, we stated: "In other words, we may reverse Smith's conviction only if the prosecutor's improper conduct *so affected the jury's ability to consider the totality of the evidence fairly that it tainted the verdict* and deprived Smith of a fair trial." *Id.* (emphasis added). That is the statement we quoted in *Sarkisian*. *See* 197 F.3d at 981 ("The issue for this court is whether the jurors' exposure to Juror Yerkes's [prejudicial comments] 'so affected the jury's ability to consider the totality of the evidence fairly that it tainted the verdict.'" (quoting *Smith*, 962 F.3d at 935)). In *Sarkisian*, however, we offered no explanation as to why an articulation of the plain error standard of review for prosecutorial vouching should be the standard in a case where (1) the plain error standard was inapplicable and (2) the error was juror bias, not prosecutorial vouching.

In sum, we conclude that the district court erred in applying *Sarkisian*'s version of the plain error standard when assessing whether Sanchez was prejudiced by the presence of a biased juror. *Sarkisian* is neither binding nor persuasive authority on this issue because it expressly declined to decide whether the *Remmer* presumption-of-prejudice standard should apply; its only reason for questioning *Remmer*'s applicability contravened our precedent; and it

---

[13] Federal Rule of Criminal Procedure 52(b) states: "A plain error that affects substantial rights may be considered [on appeal] even though it was not brought to the court's attention." To establish plain error, the defendant must show (1) error, that is (2) "clear or obvious, rather than subject to reasonable dispute," and that (3) "affected the appellant's substantial rights, which in the ordinary case means he must demonstrate that it affected the outcome of the [trial] court proceedings." *Puckett v. United States*, 556 U.S. 129, 135 (2009) (citation modified).

provided no reasoned explanation for applying the plain error standard instead.

We are also unpersuaded by the Government's arguments against applying *Remmer* here. The Government argues that *Remmer* applies only when the juror taint comes from an external source. But, as noted, that argument cannot be squared with *Shapiro*'s holding that *Remmer* applies when "jury taint originates from within the jury itself." 669 F.2d at 603.[14]

---

[14] The Government relies on a quote it takes out of context from *Lewis v. Andes*, 95 F.4th 1166, 1187 (9th Cir. 2024), a habeas case in which we reviewed a state conviction under AEDPA, 28 U.S.C. § 2254(d). In *Lewis*, we stated that "the *Mattox-Remmer* framework applies only if an extraneous source influenced the jury's deliberations." 85 F.4th at 1187. *Lewis* is part of a line of cases that includes *Fields v. Brown*, 503 F.3d 755, 777–80 (9th Cir. 2007) (en banc), and *Kipp v. Davis*, 971 F.3d 866, 881 (9th Cir. 2020) ("The *Mattox-Remmer* framework set forth by the Supreme Court governs juror misconduct claims involving consideration of extraneous evidence during deliberations[.]"). In *Fields*, *Kipp*, and *Lewis*, jurors had considered personal religious beliefs during penalty-phase deliberations in capital cases, and the question was whether such personal religious beliefs are impermissible extraneous sources or evidence. *See Fields*, 503 F.3d at 777–80; *Kipp*, 971 F.3d at 881; *Lewis*, 95 F.4th at 1186–87. We did not consider whether racial bias or racially biased statements implicating the defendant's race are impermissible "extraneous evidence" or "extraneous sources" of influence, or whether the *Mattox-Remmer* framework applies when a racially biased juror participates in deliberations and the bias is discovered before the jury is discharged. *See Fields*, 503 F.3d at 778–83; *Kipp*, 971 F.3d at 881–82; *Lewis*, 95 F.4th at 1187–88.

Further, to the extent *Mattox v. United States*, 146 U.S. 140, 148–49 (1892) addressed the no-impeachment rule, which applies only after the jury has been discharged, it has been superseded by *Peña-Rodriguez*. *See* 580 U.S. at 216 (discussing *Mattox*). In *Peña-Rodriguez*, the Supreme Court explained that the no-impeachment rule codified at

The Government also suggests that *Remmer* does not apply when the tainted juror is excused before the trial court accepts a verdict. But we also rejected that "interpretation of *Remmer* as too narrow" in *Shapiro*. 669 F.2d at 599. Indeed, we held that *Remmer* applied even though the tainted juror was excused before the jury began deliberating. *See id.* at 599–600 (agreeing with the Sixth Circuit's reasoning in *United States v. Ferguson*, 486 F.2d 968, 971 (6th Cir. 1973)). We explained that a showing that a tainted juror was removed "before he had the opportunity to discuss the case with other members of the panel would be some evidence that no prejudice occurred," "[y]et it would not so change the inquiry that there should no longer be a presumption of prejudice." *Id.* at 599 (quoting *Ferguson*, 486 F.2d at 971).

To the extent the Government argues that *Remmer* should not apply where the source of juror taint is racial bias, rather than corruption, we disagree. In *Shapiro*, the juror was "tainted" because he was willing to acquit for improper reasons. The racially biased juror here was similarly willing to convict for improper reasons. If a different standard is required, racial bias should be subject to a more stringent prejudice standard than other forms of juror taint, not a lesser one. *See Peña-Rodriguez*, 580 U.S. at 224–25 (explaining

---

Federal Rule of Evidence 606(b) has only limited exceptions, but it held that the Sixth Amendment requires "that the no-impeachment rule give way" when "a juror makes a clear statement that indicates he or she relied on racial stereotypes or animus to convict a criminal defendant." *Id.* at 217–18, 225. Although *Kipp* and *Lewis* postdate *Peña-Rodriguez*, those cases do not involve racial bias, and we did not consider whether *Remmer* applies in cases involving juror racial bias discovered before the jury is discharged in light of the Court's reasoning in *Peña-Rodriguez*. *See infra* pp. 36–39 (discussing implications of *Peña-Rodriguez* for application of *Remmer*). For all these reasons, the Government's reliance on *Lewis* is misplaced.

"there is a sound basis to treat racial bias with added precaution" because "racial bias implicates unique historical, constitutional, and institutional concerns").

In *Peña-Rodriguez*, the Supreme Court held that "the Constitution requires an exception to the no-impeachment rule when a juror's statements indicate that racial animus was a significant motivating factor in his or her finding of guilt"—even though no exception is recognized for other types of juror bias and misconduct.[15] 580 U.S. at 221–25. "A constitutional rule that racial bias in the justice system must be addressed—including, in some instances, after the verdict has been entered—is necessary to prevent a systemic loss of confidence in jury verdicts, a confidence that is a central premise of the Sixth Amendment trial right." *Id.* at 225.

The Court identified three reasons why courts have a heightened duty to address juror racial bias. First, the ratification of the Civil War Amendments gave "new force and direction" to the "imperative to purge racial prejudice from the administration of justice." *Id.* at 221.

> Beginning in 1880, the Court interpreted the Fourteenth Amendment to prohibit the exclusion of jurors on the basis of race. The Court has repeatedly struck down laws and

---

[15] The "no-impeachment" rule generally bars a court from receiving into evidence a juror's testimony or declaration about what may have occurred during deliberations or that otherwise could reveal a juror's mental process in reaching a verdict. *Peña-Rodriguez*, 580 U.S. at 215–19; *see also* Fed. R. Evid. 606(b). Because the no-impeachment rule applies only after the jury has been discharged, it is not at issue in this case, where evidence of racial bias came to light before the court accepted the jury's verdict.

practices that systematically exclude racial minorities from juries. To guard against discrimination in jury selection, the Court has ruled that no litigant may exclude a prospective juror on the basis of race. In an effort to ensure that individuals who sit on juries are free of racial bias, the Court has held that the Constitution at times demands that defendants be permitted to ask questions about racial bias during *voir dire*.

*Id.* at 222–23 (internal citations omitted). "The unmistakable principle underlying these precedents is that discrimination on the basis of race, 'odious in all aspects, is especially pernicious in the administration of justice.'" *Id.* at 223 (quoting *Rose v. Mitchell*, 443 U.S. 545, 555 (1979)). Because "[t]he jury is to be a criminal defendant's fundamental protection of life and liberty against race or color prejudice, [p]ermitting racial prejudice in the jury system damages both the fact and the perception of the jury's role as a vital check against the wrongful exercise of power by the State." *Id.* (internal quotation marks and citations omitted).

Second, unlike other types of juror misconduct and bias, "racial bias [is] a familiar and recurring evil that, if left unaddressed, would risk systemic injury to the administration of justice." *Id.* at 223–24 (explaining that "[r]acial bias . . . differs in critical ways from the compromise verdict in *McDonald* [*v. Pless*, 238 U.S. 264 (1915)], the drug and alcohol abuse in *Tanner* [*v. United States*, 483 U.S. 107 (1987)], or the pro-defendant bias in *Warger* [*v. Shauers*, 574 U.S. 40 (2014)]").

Third, "[r]acial bias is distinct in a pragmatic sense as well." *Id.* at 224.  Some "safeguards to protect the right to an impartial jury . . . can disclose racial bias[,] . . . [y]et their operation may be compromised, or they may prove insufficient." *Id.*  For example, the Court recognized that it is difficult to determine whether a prospective juror is racially biased during voir dire:

> [The] Court has noted the dilemma faced by trial court judges and counsel in deciding whether to explore potential racial bias at *voir dire*.  Generic questions about juror impartiality may not expose specific attitudes or biases that can poison jury deliberations.  Yet more pointed questions "could well exacerbate whatever prejudice might exist without substantially aiding in exposing it."

*Id.* at 224–25 (quoting *Rosales-Lopez v. United States*, 451 U.S. 182, 195 (1981) (Rehnquist, J., concurring in result)).

In addition, "[t]he stigma that attends racial bias may make it difficult for a juror to report inappropriate statements during the course of juror deliberations." *Id.* at 225.  As the Court explained,

> It is one thing to accuse a fellow juror of having a personal experience that improperly influences her consideration of the case[.] . . . It is quite another to call her a bigot. . . . All forms of improper bias pose challenges to the trial process.  But there is a sound basis to treat racial bias with added precaution.

*Id.*

Thus, *Peña-Rodriguez* makes clear that, because "racial bias implicates unique historical, constitutional, and institutional concerns," our duty as a court to eliminate racial bias from the jury is greater than for other types of juror taint. *Id.* at 223–24. *Remmer*'s presumption of prejudice applies to the types of juror taint that the Supreme Court explained warrant *less* stringent precautions than racial bias. *See Remmer*, 347 U.S. at 229 ("In a criminal case, any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is . . . deemed presumptively prejudicial[.]"). Indeed, *Remmer* involved only one outside contact with a single juror, which the trial court determined to be a joke. *Id.* at 228. In *Peña-Rodriguez*, the Court explained that "[t]o attempt to rid the jury of every irregularity of this sort" would be unworkable—but "[t]he same cannot be said about racial bias." 580 U.S. at 224. Given that "every irregularity of this sort" must be deemed presumptively prejudicial under *Remmer*, there can be no doubt that the presence of a racially biased juror or racially biased comments made by a juror during jury deliberations must also be deemed presumptively prejudicial.

Next, we address Sanchez's argument that we should go further than applying the *Remmer* presumption of prejudice and conclude that the biased juror's presence in this case was structural error under *Dyer*.

In *Dyer*, we noted that "the presence of a biased juror introduces a structural defect not subject to harmless error analysis." 151 F.3d at 973 n.2 (citing *Arizona v. Fulminante*, 499 U.S. 279, 307–10 (1991)). In other words, "[t]he presence of a biased juror cannot be harmless; the error requires a new trial without a showing of actual prejudice." *Id.* (citing *United States v. Allsup*, 566 F.2d 68, 71 (9th Cir.

1977)). These statements, read out of context, could be construed as establishing a general rule that the presence of a biased juror at any stage of a criminal trial is structural error. The Government contends, however, that *Dyer* held only that a biased juror's presence is structural error when the juror's vote contributes to the verdict that the district court accepts. We agree.

In *Dyer*, the evidence of a juror's bias was not discovered until after the jury had delivered a guilty verdict. *See id.* at 973–78.[16] After a brief hearing, the state trial court found that the juror was not biased and allowed the juror to remain on the jury for the penalty phase. *Id.* at 973. The defendant eventually filed a habeas petition in federal court contending his conviction should be set aside because the presence of a biased juror violated his Sixth Amendment right. *See id.* When we considered the petition, the main issue was whether we should set aside the state trial court's finding of no bias because "'the material facts were not adequately developed' by the state courts." *Id.* at 973 (quoting 28 U.S.C. § 2254(d)(3) (1994)). After concluding that we should set aside that finding, we found that the facts "add[ed] up to that rare case where we must presume juror bias" and reversed the denial of Dyer's habeas petition. *Id.* at 979–85. It was seemingly undisputed that the presence of the biased juror through verdict was structural error that entitled Dyer to a new trial without any showing of actual prejudice—we stated that rule in a brief footnote, without discussion. *Id.* at 973 n.2. Further, we had no reason to address which

---

[16] In *Dyer*, we found that the juror was predisposed to convict because of her experience as a crime victim; racial bias was not at issue. *See* 151 F.3d at 979–85.

standard should apply when a biased juror is excused before the jury returns a verdict.[17]  *See id.*

Sanchez, however, does not argue that *Dyer*'s structural error standard should apply in *all* cases in which a biased juror is present but excused before the trial court accepts a verdict.  Rather, he argues that there was structural error here because a racially biased juror participated in virtually all of the deliberations and was excused only thirteen minutes before the court accepted the verdict.  Sanchez argues with some persuasive force that the difference between this case and *Dyer* is technical rather than meaningful.  Further, as discussed, the Supreme Court's reasoning in *Peña-Rodriguez* supports his contention that racial bias warrants a stricter standard than *Remmer*.

Still, we decline to hold that *Dyer* applies in some cases in which a biased juror is excused before the court accepts the jury's verdict, but *Remmer* applies in others.  Where would we draw the line?  How much participation in deliberations would require the application of *Dyer* instead of *Remmer*?  Additionally, the *Remmer* framework—under which the government bears the burden of overcoming a heavy presumption of prejudice—is appropriate.  It gives district courts flexibility to address a wide range of circumstances.  *Compare Sarkisian*, 197 F.3d at 980–82 (government overcame *Remmer* presumption where juror made biased but obscure statements about an ethnic group

---

[17] Some of our reasoning in *Dyer* suggests we believed that the trial judge would have had options other than declaring a mistrial *if* the biased juror had been discovered and excused before the verdict was returned.  For example, we noted, "*Because the verdict was in*, the trial judge would probably not have been free to reopen jury deliberations, even if [an] alternate had been available."  *Id.* at 979 n.10 (emphasis added).

unrelated to the case and was removed mid-trial), *with Shapiro*, 669 F.2d at 599–600 (government did not overcome presumption where corrupt juror was removed mid-trial). It also adequately accounts for the facts that Sanchez contends warrant the application of *Dyer* in this case. For example, under the *Remmer* framework, the extent of the biased juror's participation in deliberations is case-specific evidence of prejudice that increases the government's already heavy burden to show harmlessness. *See Shapiro*, 669 F.2d at 599–603; *supra* p. 35. And where, as here, there is evidence of racial bias that relates to the case, a court can—and should—consider the constitutional and practical concerns discussed in *Peña-Rodriguez* when assessing whether the government has met its burden.

Therefore, we hold that when the presence of a racially biased juror is discovered or a juror is found to have made a racially biased statement, but that juror is excused before the trial court accepts a verdict, the *Remmer* presumption of prejudice applies.

## B.

We turn to assessing whether the Government has met its heavy burden of proving that Juror 5's presence and racially biased comments were harmless to Sanchez. *See Shapiro*, 669 F.2d at 600–03 (reviewing record to determine whether district court's special voir dire "effectively rebutted the strong presumption that prejudice infected the proceedings").

The Government argues this case is closely analogous to *Sarkisian*, where we concluded that the government effectively rebutted the *Remmer* presumption. *See Sarkisian*, 197 F.3d at 981 n.5. We disagree. There are three

significant differences: First, in *Sarkisian*, the juror's bias concerned an ethnic group unrelated to the defendants. *Id.* at 981–82 ("There was no evidence in the case suggesting that the defendants were gypsies, and none of the jurors gave any indication of thinking that the defendants may be gypsies."). Here, Juror 5 made statements that demonstrated bias against Mexicans, and Sanchez is of Mexican descent. Second, in *Sarkisian*, the special voir dire showed that only two jurors heard the biased juror make a vague reference to an unrelated ethnic group when describing a bizarre phone call she had received. *Id.* at 980 & n.4. Neither of the two jurors "understood what she meant," and "both thought that [the reference] was so obscure that none of these jurors could understand it." *Id.* at 981–82. Here, at least four jurors (Jurors 12, 15, 16, and 25) heard Juror 5 make specific statements when explaining his view of the case; they understood what Juror 5 stated; and they understood that his statements related to Sanchez. Third, the biased juror in *Sarkisian* was excused mid-trial—before the jury began deliberating. *Id.* at 980. Here, Juror 5 participated in almost the entirety of the deliberations. And Juror 5's presence throughout deliberations is evidence that prejudice occurred. *Cf. Shapiro*, 669 F.2d at 599 (explaining that removal of juror *before* deliberations "would be some evidence" that prejudice did *not* occur).

The Government also argues that the district court's special voir dire and instructions to the remaining eleven jurors demonstrate that Juror 5's participation in deliberations was harmless to Sanchez. Again, we disagree. To understand why, it is important to recognize that the biased juror's presence during deliberations could have prejudiced Sanchez in at least two ways. First, Juror 5's expressly biased comments may have influenced other

jurors.[18]  Second, Juror 5's racial bias may have tainted his assessment of the evidence, and his biased assessment may have influenced other jurors.  In this manner, Juror 5's racial bias could have tainted other jurors' views even if they did not hear any of his expressly biased comments.

These "[t]wo possibilities of prejudice against the defendant[] exist independently of [Juror 5's] presence on the jury" at verdict.  *Shapiro*, 669 F.2d at 599–600 (identifying ways in which juror could have prejudiced defendant even though removed before deliberations).  But the district court considered only the first possibility of prejudice, not the second.  When conducting the special voir dire, the district court asked the jurors only whether they heard another juror make a comment that might reflect bias.  Although the court found that Juror 5 could not "deliberate fairly and impartially," the court did not try to assess the extent to which Juror 5 expressed his views of the evidence to other jurors.  When assessing whether prejudice occurred, the district court framed the issue as "whether Juror 5's comments 'so affected the jury's ability to consider the totality of the evidence fairly that it tainted the verdict,'" and the district court's reasoning makes clear that it considered only Juror 5's expressly biased comment about Mexicans.  *Sanchez*, 692 F. Supp. 3d at 1033.  Likewise, when the district court denied Sanchez's motion for a new trial, it explained that "the majority of the jury . . . informed the Court that it had no awareness of Juror 5's [racist]

---

[18] Juror 5 made at least two expressly biased statements during deliberations: (1) a statement to the effect of "Mexicans hate Americans and they will do anything to get over on us," and (2) when discussing Sanchez's employer, Fiesta Pro Services, a statement to the effect of, "You don't know how deep things run. . . . I've spent time in [REDACTED], and, you know, it could have come up from the cartel."

comments," and that "each juror unambiguously informed the Court that those comments did not affect their deliberations or individual verdicts," but it did not address the possibility that the remaining jurors could have been influenced by Juror 5's bias in other ways. *Sanchez*, 692 F. Supp. 3d at 1033–34. Further, when the district court told the remaining eleven jurors to resume deliberations, it did not direct them to disregard all past deliberations and begin deliberations anew. *Cf. Bayramoglu v. Estelle*, 806 F.2d 880, 889 (9th Cir. 1986) (distinguishing *Shapiro* and denying habeas petition challenging state court conviction where juror's bias was based on personal experience, not racial bias against the defendant; biased juror was removed before verdict and replaced with alternate; and trial court specifically instructed jury to disregard all past deliberations and "begin deliberations anew"). Such an instruction was especially necessary here because the jury deliberated for hours with Juror 5 and even reached its partial verdict with him.

We recognize that the district court engaged in an extensive inquiry to address the first possibility of prejudice—the potential impact of Juror 5's expressly biased comments. However, that inquiry did not fully account for the possibility that a juror heard one or more of Juror 5's biased comments but subjectively perceived the comment as innocuous.

When the district court tried to determine whether other jurors heard a biased comment during deliberations, it first asked the jurors, "Have you heard any comment by any other juror which might reflect some bias based upon race,

ethnicity, national origin?"[19]  If a juror heard an objectively biased comment but did not subjectively perceive it as biased, they could truthfully respond "no" to that question.

Indeed, at least two jurors—Juror 12 and Juror 15—did just that: they each heard a comment that "reflects racial, ethnic, or national origin bias" but responded "no" when first asked if they heard such a comment. *See supra* pp. 11–12 (Juror 15), 16–17 (Juror 12).  We know that Juror 12 and Juror 15 each heard a biased comment only because they reported what they heard after the district court repeated its question in some fashion—and even then, both jurors downplayed the significance of the comment while explaining that they did not believe the comment reflected actual bias.[20]  Juror 12 apparently heard Juror 5's comment that "Mexicans hate Americans and they will do anything to get over on us," but told the district court: "I don't believe that there was anything said that was biased.  There w[ere] comments that I heard about – how do I put this? – like, how the Hispanic community kind of pulls together for themselves, but I didn't take that as any – anything biased at all."  Juror 15 heard Juror 5 claim during deliberations that he had reason to believe that Sanchez's employer, Fiesta Pro Services, "could have come up from the cartel."  But Juror 15 explained that she thought the comment was made "in

---

[19] There were some minor variations in the form of this initial question that do not affect our analysis.  *See supra* note 3.

[20] That Juror 12 and Juror 15 ultimately reported what they heard despite their subjective belief that the comments were not biased does not necessarily mean that *all* jurors who heard a biased comment but perceived it as innocuous did the same.

jest" and she didn't think that comment "was a racist one."[21] That two jurors heard racially biased comments—but initially denied hearing any such comment and continued to deny that the comment was biased—weighs against finding that the Government has met its heavy burden of showing "contact with [Juror 5] was harmless to the defendant." *Remmer*, 347 U.S. at 229.

We also recognize that the district court tried to address the subjective-perception problem by asking some jurors a follow-up question that did not rely on the juror's subjective perception of bias. For example, the district court asked Juror 24, "No reference to individuals from particular countries coming to this country or anything of that sort?" Similarly, after Juror 15 reported that Juror 5 made a comment about "the cartel," the district court asked her, "Was any comment made . . . about how people of a certain race, ethnicity, or national origin might behave or anything like that . . . ?"[22] However, several jurors were never asked a comparable follow-up question. [23] Additionally, the

---

[21] *See Shapiro*, 669 F.2d at 601 ("We cannot accept the jurors' own characterization of these conversations as innocuous or joking.").

[22] The district court also asked Juror 1 (the juror who was arguing with Juror 16 when Juror 5 made the biased comment about Mexicans) whether he heard "anyone else, maybe in response to that exchange [with Juror 16] or at any other time," make any comment that included "the word 'Hispanic,' 'Spanish,' 'Mexican,' 'from Mexico,' [or] anything like that."

[23] A total of seven jurors did not report hearing Juror 5 make any biased comment (Jurors 24, 33, 28, 8, 4, 2, and 1). Two of those seven were asked a question that did not rely on their subjective perception of bias (Jurors 24 and 1); five were not (Jurors 33, 28, 8, 4, and 2).

district court did not ask any juror whether they heard a comment referring to "the cartel." [24]

It is also possible that other jurors heard biased statements but were too reluctant to report them to the court. As the Supreme Court has explained, "[t]he stigma that attends racial bias may make it difficult for a juror to report inappropriate statements during the course of juror deliberations." *Peña-Rodriguez*, 580 U.S. at 225. "It is one thing to accuse a fellow juror of having a personal experience that improperly influences her consideration of the case . . . . It is quite another to call her a bigot." *Id.* at 225.

The Supreme Court's concern about juror reluctance to report racially biased statements is substantiated by the record here. Even though four jurors reported hearing Juror 5 make biased comments, only one, Juror 16, notified the court before the special voir dire. Moreover, as noted above, two of those four jurors initially responded "no" when asked whether they heard any comment that might reflect bias— and expressed a personal belief that the comment they reported hearing was *not* biased.

Additionally, several jurors said "yes" when asked whether they heard a comment that might reflect racial bias but identified Juror 16's *accusation* of racism as the biased comment. Some jurors reacted strongly to Juror 16's accusation of racism—apparently more strongly than Jurors

---

[24] As noted, the district court directed some jurors to report comments that might reflect bias even if they thought the "statement was made in jest" or "not made seriously." *See supra* note 4. Of the seven jurors who did not report hearing Juror 5 make a biased comment, three were given that direction (Jurors 8, 4, and 2); four were not (Jurors 24, 33, 28, and 1).

12, 15, and 25 reacted to Juror 5's biased statements. As Juror 15 explained, "we were discussing and all of that, and one of the jurors said something to one of the other jurors, 'Well, at least I'm not racist.' And that was kind of shut down right away. One of the women said, 'That's really uncalled for.'" Juror 28 similarly testified that other jurors "leapt to the defense of [Juror 1]" and said, "Whoa. Nobody is being racist." Juror 8 told the court it was "not acceptable" for Juror 16 to accuse someone of racism.

There is no way to know from the record whether the jurors who did not report a racially biased comment did not hear such a comment—or heard one but either subjectively perceived it as innocuous or were reluctant to accuse another juror of racism. Likewise, we do not know the full extent and nature of Juror 5's participation in deliberations. The Government had the opportunity to suggest additional questions and different jury instructions to the district court, but it did not. Because the Government bears the heavy burden of dispelling the presumption and evidence of prejudice, we must resolve the ambiguity in the record against the Government. *See Shapiro*, 669 F.2d at 599 ("The jurors' responses to these questions must be evaluated in the context of the heavy burden that falls upon the government . . . .").[25]

---

[25] In *Shapiro*, the district court removed the tainted juror before deliberations began and conducted a special voir dire with each juror "to determine whether Leoni had affected them," and "each juror stated that he had not been contacted about the case, and had not discussed with other jurors the guilt or innocence of any party." 669 F.2d at 599–600. We noted, however, that several jurors admitted they had conversations about the case despite the court's directive not to do so. *Id.* at 601. Even though the record did not conclusively show that Leoni spoke to any jurors about the case, the fact that some conversations occurred meant

The Government notes that the district court found the remaining 11 jurors "unequivocally expressed their view that they were not affected by any statement or any accusation of discrimination." This finding, however, merely reflects the jurors' self-assessments of prejudice. "[A] juror's good faith belief in his own impartiality is not dispositive." *Shapiro*, 669 F.2d at 601 (citing *Irvin v. Dowd*, 366 U.S. 717, 727–28 (1961)). "The effect of extrinsic prejudicial evidence on a juror's deliberation may be substantial even though it is not perceived by the juror and 'a juror's good faith cannot counter this effect.'" *Jeffries v. Wood*, 114 F.3d. 1484, 1491 (9th Cir. 1997) (quoting *United States v. Williams*, 568 F.2d 464, 471 (5th Cir. 1978)); *see also Caliendo v. Warden of Cal. Men's Colony*, 365 F.3d 691, 699 (9th Cir. 2004) (jurors' assertions that an improper encounter had no influence on them "did not suffice to meet the government's heavy burden of proving harmlessness"). This general principle—that jurors' self-assessments of prejudice are not reliable enough to be dispositive—is supported by the record in this case, as at least two jurors heard biased comments but did not subjectively perceive them as biased.[26]

---

Leoni "*may* have commented on the merits of the case in the presence of the other jurors." *Id.* (emphasis added). "[G]iven the heavy presumption against the government," that possibility alone was enough to "present a very close case." *Id*.

[26] The Dissent wrongly asserts that we have effectively established a "*per se* rule . . . requiring a mistrial" whenever "there is a whiff of juror racial bias" at any point during trial. Dissent at 69, 77 n.17. Although the *Remmer* presumption of prejudice is "heavy," it is not insurmountable. Indeed, as the Government acknowledges, *Sarkisian* itself is an example where the Government succeeded in rebutting the presumption of prejudice. *See Sarkisian*, 197 F.3d at 981 n.5. Further,

For all these reasons, we conclude that the Government has not effectively rebutted the strong presumption and evidence that the racially biased juror's presence prejudiced Sanchez.[27]

## IV.   CONCLUSION

When a juror is racially biased or makes a racially biased statement, but that juror is excused before the trial court accepts a verdict, the *Remmer* presumption of prejudice applies, and the Government bears the heavy burden of rebutting that presumption and proving that the racially biased juror's presence was harmless to the defendant. Additionally, when a biased juror has participated in deliberations, such participation is additional evidence of prejudice that the Government must overcome.  In this case, a racially biased juror participated in all but the last thirteen minutes of the jury's deliberations, which spanned many hours across two days.  Because the Government has not met its burden to show Juror 5's presence and racially biased statements were harmless, Sanchez is entitled to a new trial. Accordingly, we **REVERSE** the district court's denial of Sanchez's motion for a new trial, and we **REMAND** for a new trial.

---

as noted above, this might have been a different case had the Government requested, and the district court taken, some or all of the additional remedial steps that were available—such as seating an alternate juror or instructing the jury to disregard all past deliberations and begin deliberations anew.

[27] We do not reach Sanchez's alternative argument that the district court erred by not investigating the allegation of juror bias on the basis of sexual orientation.

BEA, Circuit Judge, concurring in part and dissenting in part:

"One may not know or altogether understand the imponderables which cause one to think what he thinks, but surely one who is trying as an honest man to live up to the sanctity of his oath is well qualified to say whether he has an unbiased mind in a certain matter." *Dennis v. United States*, 339 U.S. 162, 171 (1950).  My colleagues disagree that a juror can effectively state whether his judgment of the evidence has been affected by another juror's racist remarks made during jury deliberations because they think the ordinary person is not sufficiently enlightened to realize the impact of racially biased comments heard on his ability to be a fair and impartial juror.

Instead, my colleagues hold that it is for us judges to determine the impact of racially biased comments on a juror's mind.  And what is that impact?  Each juror is presumptively tainted, regardless whether that juror unequivocally says he can remain fair and impartial notwithstanding the racially biased comment.  And, a mistrial must be declared, unless the Government can overcome that presumption.

To reach this result in this case, my colleagues first reject this Court's binding precedent in *United States v. Sarkisian*, 197 F.3d 966 (9th Cir. 1999), to conclude the district court applied an incorrect legal standard when determining whether defendant Sanchez was prejudiced by the racially biased juror's presence.  Then my colleagues rely upon a faulty reading of *Peña-Rodriguez v. Colorado*, 580 U.S. 206

(2017), to extend *Remmer*'s presumption of prejudice[1] to situations where, absent any outside contact to or from the jury itself, a racially biased juror participates in some jury deliberations, but is removed from the jury following a report of misconduct by a juror to the judge and before the jury's final verdict is reached, and the trial court accepts the verdict.  Finally, my colleagues create an insurmountable standard that the Government must satisfy to rebut their newly fabricated presumption of prejudice.  Predictably, my colleagues conclude the Government has not accomplished this insurmountable task.  Accordingly, they reverse the denial of Sanchez's motion for a new trial and remand for a new trial.  Because I would affirm the denial of Sanchez's motion for a new trial, I respectfully dissent.[2]

## I.

On the fifth day of trial in Sanchez's case, the district court informed the parties that it had become aware of a potential problem in the jury deliberations.  Earlier that morning, one of the jurors, Juror 16, gave the jury commissioner a folded piece of paper and said, "I don't know if I give this to you or I give this to the clerk."  The jury commissioner informed Juror 16 that he should give the

---

[1] "[A]ny private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial, if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties."  *United States v. Remmer*, 347 U.S. 227, 229 (1954).

[2] Nonetheless, I concur with the majority's opinion that *Dyer v. Calderon*'s structural error standard does not apply when the presence of a racially biased juror is discovered or a juror is found to have made a racially biased statement, but that juror is excused before the trial court accepts a verdict.  Maj. Op. at 41–42.

note to the clerk. Juror 16 communicated with the law clerk and told him that "'there is some stuff going on in the jury room, some racism I don't want to be a part of,' or something to that effect." Soon thereafter, the court received a note from the jury indicating they may have reached a verdict on some but not all counts. The court and counsel agreed that a thorough investigation into Juror 16's allegations was warranted before accepting the jury's verdict. Maj. Op. at 5–6. The court undertook such an investigation by questioning the jurors in the presence of counsel. Maj. Op. at 6–20. After the court concluded his questioning of a juror and asked the juror to leave the room, the court asked counsel if they had any further follow-up questions for the juror. Defense counsel proposed only one additional question to the court.[3] Through its investigation, the court determined Juror 5 had made a racially biased statement about Mexicans.[4] Maj. Op. at 22. Following the court's investigation, Sanchez renewed his motion for a mistrial, which the court denied, but the court did excuse Juror 5 for good cause under Federal Rule of Criminal Procedure 23(b)(3).[5] Maj. Op. at 20–23. Before he called the jury back in to court, the judge informed counsel that he would "excuse Juror No. 5 here in open court" and "instruct [the remaining jury of eleven] simply to resume their deliberations." He told counsel that he would not "give them any other instruction beyond that unless counsel now

---

[3] The court did not ask this question because the transcript from questioning the jurors showed that defense counsel's proposed question had already been answered.

[4] Defendant Sanchez is of Mexican nationality and ethnicity.

[5] After the court informed counsel that it had reviewed Juror 16's note, Sanchez moved for a mistrial, which the court took under advisement.

request[ed] it." Sanchez's counsel did not request any further instruction, such as an instruction that the jury start deliberations anew, but he did object to the court not granting his motion for a mistrial. The court called the jury back in and excused Juror 5 because "our system is so incredibly vital and important to the public's respect for the rule of law, that even the appearance of impropriety requires us to take certain steps just to ensure that there is complete confidence in the fairness of the process and the impartiality of the legal system." After Juror 5 left the courtroom, the court directed the jury to "resume deliberations" and "consider . . . whether excusing Juror No. 5 and functioning as a jury of 11, whether you have reached a different verdict or would reach a different verdict. That's up to you to decide."[6] As my colleagues write, the jurors resumed deliberations for thirteen minutes and returned a partial verdict. Maj. Op. at 24.

The district court denied Sanchez's renewed motion for a new trial, citing *Sarkisian*, 197 F.3d at 981 (citing *United States v. Keating*, 147 F.3d 895, 903 (9th Cir. 1998)). *United States v. Sanchez*, 692 F. Supp. 3d 1025, 1034 (D. Idaho 2023). The court noted "this case presents a unique set of circumstances that the Court, and apparently the parties, have been hard-pressed to find any analogous authority." *Id.* at 1030. Then, the court described the factual similarities between this case and *Sarkisian*. *Id.* at 1032–33. Therefore,

---

[6] The district court did not abuse its discretion in permitting the jury of eleven persons to resume deliberations and return a verdict because he found good cause to excuse Juror 5. In *United States v. Brown*, this Court held that a district court did not abuse its discretion by proceeding with eleven jurors and directing them to resume deliberations, rather than seating an alternate juror, after excusing a juror who became ill. 784 F.3d 1301, 1301–02 (9th Cir. 2015).

the court determined "the proper question here is whether Juror 5's comments 'so affected the jury's ability to consider the totality of the evidence fairly that it tainted the verdict[.]'" *Id.* at 1033 (quoting *Sarkisian*, 197 F.3d at 981).

The district court in *Sanchez* described that, like the district court in *Sarkisian*, it had (1) questioned each juror individually, (2) found that most jurors "had no awareness of" or did not "hear any" biased comments, and (3) found that each of the jurors who had heard the biased comments "unambiguously" said the comments did not affect their deliberations or individual verdicts. *Id.* at 1033–34. Therefore, the court found "there is no reason to believe that the Court's efforts to cure the jury of any potential bias was insufficient to protect Mr. Sanchez's Sixth Amendment rights as to the remaining eleven jurors." *Id.* at 1034. Accordingly, the district court denied Sanchez's motion for a new trial. *Id.* Sanchez appealed.

## II.

The district court correctly denied Sanchez's motion for a new trial. It faithfully applied our precedent, which holds that, in cases where jurors hear another juror's racially biased statement, the relevant question is whether the racially biased statement "so affected the jury's ability to consider the totality of the evidence fairly that it tainted the verdict." *Sarkisian*, 197 F.3d at 981 (quoting *United States v. Smith*, 962 F.2d 923, 935 (9th Cir. 1992)). Yet the majority concludes that the district court erred when it followed *Sarkisian*, not because the district court improperly applied *Sarkisian*, but because the majority disagrees that *Sarkisian* states the applicable law. Maj. Op. at 33–34. That is wrong. Although we may criticize a previous case's explanation of its reasoning, so long as it remains good law

and is applicable, we are bound to follow it. *Societe Civile Succession Guino v. Renoir*, 549 F.3d 1182, 1190 (9th Cir. 2008). As the district court in *Sanchez* rightly recognized, the factual similarities between *Sarkisian* and *Sanchez* are striking.

During the district court trial in *Sarkisian*, a problem arose with two of the seated jurors, which led to the two jurors being excused prior to jury deliberations. 197 F.3d at 975. One juror, Arthur Barnello ("Barnello") was dismissed because he "discuss[ed] the case with an FBI agent who attended Barnello's church." *Id.* at 980 n.3. The other juror, Angela Yerkes ("Yerkes"), was excused because she made a "prejudicial statement against 'gypsies'" and was upset because "some unknown person had called the police and told them that Yerkes's son had killed [Yerkes]." *Id.* at 980.

The district court became aware of the potential problem with Yerkes because she informed the court "she had a problem." *Id.* During her conversation with the judge, Yerkes told the judge about the phone call made to the police and then made the following statements about gypsies:

> Yerkes (to the Court): When you first asked the questions do you have any problem with serving on this jury I didn't understand or didn't know what the case was. In our business that I worked for for many years we do not allow gypsies into our business because they wreak havoc and whatnot.
>
> * * *
>
> The Court: I don't understand what you mean by gypsies.

> Yerkes: I made the mistake of asking them
> where they are from, and they said, "We are
> gypsies. We are from anywhere." They have
> had bad luck, and I'm not sure that I can
> honestly give an opinion understanding that
> they are—*the defendants in this case are
> gypsies*.

*Id.* (emphasis added). When the judge attempted to clarify
what Yerkes meant, she became upset and "had difficulty
answering his questions." *Id.* The judge excused her. *Id.*
"[T]he court and all counsel agreed to hold individual *in
camera* meetings with each juror to determine what Yerkes
may have told them." *Id.*

In camera questioning of jurors revealed that Yerkes
informed the other jurors about the phone call to the police
that Yerkes's son had killed Yerkes and that the jurors
advised her to inform the judge. *Id.* The judge told each
juror that the phone call was a "childish prank" and that it
"had nothing to do with the reason why Juror Barnello was
excused." *Id.* at 981. The judge asked each juror to
determine whether Yerkes's comments affected the juror's
ability to be fair and impartial. *Id.* All jurors denied any
such effect. *Id.* The questioning also revealed that two
jurors had heard Yerkes say "something about gypsies.
Neither juror, however, understood what she meant." *Id.* at
980. Juror number 10 stated that he "didn't understand what
she was saying. It didn't make a whole lot of sense to us, and
she asked us if she was a gypsy." *Id.* at 800 n.4. Juror
number 12 stated that Yerkes said "something sort of
disjointed, something about gypsies, and asked if anyone
knew anything about gypsies, which nobody really got the

gist of, and that was it. That's about all I remember about the conversation." *Id.*

Defendants in *Sarkisian* filed a motion with the district court for a mistrial "because the jury was tainted by Juror Angela Yerkes's prejudicial statement against 'gypsies.'" *Id.* at 980.[7] The district court denied defendants' motion for a mistrial because he was "'110 percent satisfied that we have an unbiased, unprejudiced jury.'" *Id.* at 982. The jury convicted defendants on either all or most of the charges. *Id.* at 975. Defendants appealed, arguing the district court erred in denying their motion for a mistrial based on a claim that the defendants' Sixth Amendment right to a fair trial before an unbiased jury had been violated. *Id.* at 980–81.

We held that the district court did not abuse its discretion in denying defendants' motion because Yerkes's "comment did not affect the jury's ability to consider the totality of the evidence fairly or taint the verdict." *Id.* at 982. We concluded "the district court took sufficient steps to ensure the jurors were not prejudiced by Yerkes's statement about gypsies." *Id.* at 981. We determined the district court

---

[7] All the defendants were of Armenian or Russian descent. *Sarkisian*, 197 F.3d at 978. On appeal to this Court, Defendant-Appellant Ivanchikov stated that "[t]he jury was influenced by . . . Yerkes expressing her bias against 'gypsies'" because "Gypsies historically come from Eastern Europe," which includes Armenia and Russia. Br. for Appellant (Sergey Ivanchikov) at 45–46, 48, *Sarkisian*, 197 F.3d 966 (9th Cir. 1999) (No. 98-10261). In 2002, the Russian national census reported that there was 183,000 Roma—also known as Gypsies—in the Russian Federation. At the end of the 20th century, the Roma population in Armenia was estimated to be 5,000 to 7,000 people. CAHROM, THEMATIC VISIT ON THE SITUATION OF EASTERN ROMA GROUPS (ROMA, LOM/BOSHA, DOM/GARACHI, ABDAL) AND POLICY RESPONSES TO THEIR NEEDS, 16, 20 (2017).

holding "individual *in camera* meetings" with each juror was sufficient to decide whether the jury was tainted by Yerkes's statements. *Id.* We noted that, during *in camera* interviews, "none of the jurors gave any indication of thinking that the defendants may be gypsies" and both jurors who heard Yerkes's statement "thought that it was so obscure that [they] could [not] understand it." *Id.* at 981–82. We reiterated that "[t]he trial judge was in a better position than we are to determine whether what happened was prejudicial." *Id.* at 982 (quoting *United States v. Armstrong*, 909 F.2d 1238, 1244 (9th Cir. 1990)). Now back to Sanchez's case.

As the district court in *Sanchez* recognized, just as had the district court in *Sarkisian*, (1) it had questioned each juror individually, (2) most jurors "had no awareness of" or did not "hear any" racially biased comments, and (3) each of the jurors who heard the racially biased comments "unambiguously" said the comments did not affect their deliberations or individual verdicts. *Compare Sanchez*, 692 F. Supp. 3d at 1033–34 *with Sarkisian*, 197 F.3d at 980–81. Based on both district courts' thorough investigations into the accusations of a juror making racially biased statements, each court was confident the remaining jurors could remain fair and impartial. *Compare Sanchez*, 692 F. Supp. 3d at 1034, *with Sarkisian*, 197 F.3d at 982. My colleagues' attempt to distinguish *Sarkisian* is unconvincing. Maj. Op. at 42–43.

My colleagues make much of the fact that the juror's comments in *Sarkisian* were vague and concerned an ethnic group unrelated to the defendants, whereas Juror 5's comments in this case were clear and "demonstrated bias against Mexicans, and Sanchez is of Mexican descent." Maj.

Op. at 43.[8]  But what matters is the court's method of examination and the lack of effect that Yerkes's comments had on the remaining jurors in *Sarkisian* and the same method of examination and lack of effect which Juror 5's comments regarding Mexicans had on the jurors in this case.

My colleagues also claim *Sarkisian* is distinguishable because "the biased juror in *Sarkisian* was excused mid-trial—before the jury began deliberating," whereas "[h]ere, Juror 5 participated in almost the entirety of the deliberations." Maj. Op. at 43.  But again, my colleagues miss the point.  Here in *Sanchez*, after much of the jury's deliberations, "all of the [remaining] jurors . . . unequivocally expressed their view that they were not affected by any statement or any accusation of discrimination; that they do not believe that their individual verdict or verdict of other jurors [were] affected by any statement or accusation of racism made during the jury's deliberations" before the jury's final verdict was reached. *Sanchez*, 692 F. Supp. 3d at 1034 (internal quotation marks omitted).

Perhaps because they recognize *Sarkisian* and *Sanchez* are not factually distinguishable, my colleagues attack

---

[8] Quite obviously, in both *Sarkisian* and *Sanchez*, the biased juror undoubtedly perceived the ethnic group the juror made a racist remark about as related to the defendant(s).  Indeed, Defendant-Appellant Ivanchikov stressed this in his opening brief on appeal to this Court.  Br. for Appellant (Sergey Ivanchikov) at 48 ("Yerkes clearly was biased against people she perceived to be 'gypsies,' which included the defendants.").  It does not matter whether the defendants were *in fact* gypsies, any more than it would matter that an antisemite was mistaken in thinking the defendant was Jewish.  What matters is that the juror was racially biased and identified the defendants as of the race as to which she was biased.

*Sarkisian*'s legal reasoning. Maj. Op. at 33–34. My colleagues offer three reasons for finding *Sarkisian* "neither binding nor persuasive authority": (1) "it expressly declined to decide whether the *Remmer* presumption-of-prejudice standard should apply"; (2) "its only reason for questioning *Remmer*'s applicability contravened our precedent"; and (3) "it provided no reasoned explanation for applying the plain error standard[.]" Maj. Op. at 33–34.

First, let us dispose of *Sarkisian*'s claimed application of the plain error standard of review. My colleagues are simply incorrect. The *Sarkisian* court did not apply the plain error standard,[9] but instead reviewed for abuse of discretion as our precedent dictates. *Sarkisian*, 197 F.3d at 981. The court relied on our decision in *Smith* to formulate the appropriate legal rule for when jurors are exposed to racially biased comments. *Id.* (quoting *Smith*, 962 F.2d at 935 ("[W]e may reverse . . . only if the . . . conduct so affected the jury's ability to consider the totality of the evidence fairly that it tainted the verdict[.]")). Then, the *Sarkisian* court, citing *Armstrong*, analyzed whether the district court's finding that "jurors were not prejudiced by Yerkes's statement about gypsies" was unsupported in the context of the entire record.

---

[9] For there to be plain error, "[t]here must be 'error' that is 'plain' and that 'affect[s] substantial rights.'" *United States v. Olano*, 507 U.S. 725, 732 (1993). "[I]n most cases ['affec[t] substantial right[s]'] means that the error must have been prejudicial: It must have affected the outcome of the district court proceedings." *Id.* at 734. Moreover, the court should not exercise its discretion to review errors that were not timely raised in district court "unless the error seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *Id.* at 732 (internal quotation marks and citation omitted).

*Id.* at 981–82. **[10]** The *Sarkisian* court found that, notwithstanding Yerkes's views of the defendants, "[t]here was no evidence in the case suggesting that the defendants were gypsies, and none of the jurors gave any indication of thinking that the defendants may be gypsies." *Id.* at 981.**[11]** My colleagues criticize *Sarkisian*'s formulation of the legal standard that applies when jurors are exposed to racially biased comments. Maj. Op. at 32–33. While *Sarkisian* may not appeal to them, this panel cannot overrule it. *Miller v. Gammie*, 335 F.3d 889, 892–93 (9th Cir. 2003) (en banc).

My colleagues claim *Sarkisian* "expressly declined to decide whether the *Remmer* presumption-of-prejudice standard should apply." Maj. Op. at 33. That is an incomplete summary of *Sarkisian* on that point. The *Sarkisian* court determined it was "unclear whether *Remmer* applies . . . because that case involved an *ex parte* communication between a juror and an outside person," so it did indeed decide not to apply the presumption. *Sarkisian*, 197 F.3d at 981 n.5.**[12]** Relevant here is that *Sarkisian* did not

---

[10] The standard of review that we applied in *Sarkisian* was akin to the abuse of discretion standard that we articulated in *United States v. Hinkson*, 585 F.3d 1247, 1261–62 (9th Cir. 2009) (en banc), not the plain error standard that the Supreme Court articulated in *Olano*, 507 U.S. at 732.

[11] True. Yerkes's statement that she believed the defendants were gypsies was made during an individual *in camera* interview with Yerkes and was not evidence presented to the jury.

[12] Contrary to what my colleagues claim, the *Sarkisian* court's brief statement in a footnote that "even if *Remmer* applies, . . . the Government adequately demonstrated that the jury's exposure to Yerkes's conduct was harmless," Maj. Op. at 31 n.12, is a phrase in the conditional mood, stated in the manner of a hypothetical, and not in the indicative mood so

apply *Remmer*'s presumption of prejudice under circumstances similar to Sanchez's case, since, unlike *Remmer*, there was no outside communication, contact, or tampering with the jury.[13]  My colleagues cannot ignore that troublesome reality simply because they dislike the result in this case.  *See Societe Civile Succession Guino*, 549 F.3d at 1190.

Further, my colleagues are incorrect that the *Sarkisian* court's "only reason for questioning *Remmer*'s applicability contravened our precedent."  Maj. Op. at 33.  My colleagues state that we "held in *Shapiro* that *Remmer* applies when the 'jury taint originates from within the jury itself'—including when the alleged taint arises from jurors' exposure to the partiality of another juror who was removed before deliberations."  Maj. Op. at 32 (quoting *United States v. Shapiro*, 669 F.2d 593, 599–600, 603 (9th Cir. 1982)).  But my colleagues ignore that *Shapiro* involved jury tampering, for which the Supreme Court had created a "special rule."[14] *United States v. Dutkel*, 192 F.3d 893, 895 (9th Cir. 1999).

---

to demonstrate the court acted to apply *Remmer* as the appropriate standard.  *Sarkisian*, 197 F.3d at 981 n.5.

[13] Other panels in this Circuit have applied *Sarkisian*'s legal standard when there was no outside contact to a juror.  *See United States v. McCormac*, 309 F.3d 623, 626 (9th Cir. 2002) (applied *Sarkisian* legal standard in affirming the district court denying defendant's motion for mistrial based on the district court holding defendant in contempt in the presence of prospective jurors).

[14] I use the phrase "jury tampering" to describe an influence outside the jury's composition as described in *Remmer*, i.e. "any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury[.]"  *Remmer*, 347 U.S. at 229.  In *Remmer*, the jury taint originated from an outsider, who attempted to bribe a juror.  *Id.* at 228.

In *Shapiro*, a juror attempted to extort money from the defendants in return for promise of a verdict of acquittal. 669 F.2d at 599. With the help of DEA undercover agents, juror number seven was identified as the extortionist and arrested. *Id.* Juror number seven was removed from the jury. *Id.* It is in this context of jury tampering that the following statement in *Shapiro* must be understood:

> We emphasize that we do not adopt a per se rule requiring that a mistrial be declared whenever jury taint originates from within the jury itself. In such situations the government has the burden of showing that the tainted juror did not influence others.

*Id.* at 603. The *Shapiro* court explained the dangers of investigating alleged jury tampering because "the questioning itself will suggest defense misconduct and thereby result in prejudice." *Id.* Further, *Shapiro* did not rely upon any case with a similar fact pattern to what we have here: juror-to-juror misconduct without any outside contact. Therefore, for non-jury tampering cases, i.e. where there was no private communication, contact, or tampering from or to sources outside the jury, even after *Shapiro*, "the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias," unless the conduct is serious and presumptively prejudicial. *Smith v. Phillips*, 455 U.S. 209, 215 (1982).[15]

---

[15] The majority mistakenly criticizes the Government for its accurate reliance on *Lewis v. Andes* to argue that *Remmer* applies only when the juror taint comes from an external source. Maj. Op. at 34 n.14. In *Lewis v. Andes*, Petitioner-Appellant claimed that "the California Supreme Court's decision 'was contrary to and an unreasonable application of

The threat to jury sanctity is much greater where there is outside contact to or from the jury itself, than where a juror merely misbehaves in the presence of the other jurors, because the jury can witness and report such misbehavior. But when a juror bribe is offered or is sought, the misbehavior occurs outside the presence and observation of the other jurors and thus may be unknown to the other members of the jury. That greater threat to jury sanctity justifies the creation of the difficult to rebut *Remmer* presumption of prejudice. But that threat is not so great when one is faced with juror misconduct—such as

---

[*Mattox* and *Remmer*]'" as an uncertified claim on appeal to this Court. 95 F.4th 1166, 1187 (9th Cir. 2024). We held,

> The *Mattox-Remmer* framework applies only if an extraneous source influenced the jury's deliberations. *See Fields v. Brown*, 503 F.3d 755, 779–80 (9th Cir. 2007) (en banc). Because Lewis fails to show that the California Supreme Court was unreasonable in concluding that the jury did not consider an extraneous source, we do not reach his *Mattox-Remmer* argument.

*Id*. The majority wrongly attempts to limit *Lewis*'s reasoning to apply only to instances where "jurors had considered personal religious beliefs" during deliberations. Maj. Op. at 34 n.14. However, even granting the majority's proposition, how can a juror's racial bias be considered an extraneous source any more than a juror's religious convictions? As we have held, "[t]he type of after-acquired information that potentially taints a jury verdict should be carefully distinguished from the general knowledge, opinions, feelings, and bias that every juror carries into the jury room." *Hard v. Burlington N.R.R. Co.*, 870 F.2d 1454, 1461 (9th Cir. 1989). Further, the *Lewis* court was not alone in recognizing that the *Remmer* presumption of prejudice applies only if an extraneous source influenced the jury's deliberations. *See Kipp v. Davis*, 971 F.3d 866, 881 (9th Cir. 2020).

expressions of racial bias from a juror, like that which occurred in *Sarkisian* and in this case.

Therefore, it is plain to me that this case is clear and we are bound by *Sarkisian*'s decision. *Hart v. Massanari*, 266 F.3d 1155, 1171 (9th Cir. 2001) ("Circuit law . . . binds all courts within a particular circuit, including the court of appeals itself."). Thus, I would affirm the denial of Sanchez's motion for a new trial.

## III.

The majority justifies its expansion of *Remmer*'s presumption of prejudice beyond its appropriate scope of outside-the-jury tampering by citing the Supreme Court's holding in *Peña-Rodriguez*, 580 U.S. at 224–25. Maj. Op. at 35–36, 39. The majority's reliance on *Peña-Rodriguez* is inapt.

In *Peña-Rodriguez*, the Supreme Court reasoned that an exception to the rule that jurors could not impeach their verdict was required in a case where expressions of racial stereotypes or animus during jury deliberations tainted jury deliberations because the existing "safeguards to protect the right to an impartial jury . . . may prove insufficient" to combat racial bias. 580 U.S. at 224–25. Those safeguards are: (1) voir dire, (2) jury observation by the court, by counsel, and by court personnel during trial, and (3) jurors reporting inappropriate behavior before they render a verdict. *Id.* at 220. The Supreme Court reasoned that "[t]he stigma that attends racial bias may make it difficult for a juror to report inappropriate statements during the course of juror deliberations." *Id.* at 225. Thus, a Colorado Rule of Evidence which disqualified a juror from impeaching the jury verdict perhaps affected by racial bias was inconsistent with federal due process guarantees. *Id.* at 227. Judicial

inquiry must be permitted "to consider the evidence of the juror's statement and any resulting denial of the jury trial guarantee." *Id.* at 225. Such judicial inquiry, as noted above, is precisely what the district court did in *Sanchez*.

However, the Supreme Court in *Peña-Rodriguez* did not "decide the appropriate standard for determining when evidence of racial bias is sufficient to require that the verdict be set aside and a new trial be granted." *Id.* at 228. Nor did the Supreme Court articulate "what procedures a trial court must follow when confronted with a motion for a new trial based on juror testimony of racial bias." *Id.* The Supreme Court reversed the judgment of the Colorado Supreme Court. *Id.* at 229. The Supreme Court remanded the case to the state court to consider the sworn affidavits from two jurors that might establish that racial considerations affected the jury verdict, without any instruction to accord a *Remmer*-like presumption of prejudice. *Id.*

The majority here ignores that the safeguards to protect the right to an impartial jury indeed worked in Sanchez's case. Unlike the jurors in *Peña-Rodriguez*, in this case, Juror 16 reported Juror 5's "inappropriate statements during the course of juror deliberations." *Id.* at 225. Further, unlike the court in *Peña-Rodriguez*, the district court here evaluated the effect of the alleged misconduct before the jury reached its verdict. Following evidentiary hearings with each juror, which are "the remedy for allegations of juror partiality," *Smith v. Phillips*, 455 U.S. at 215, the district court was "very confident that the remaining jurors did not and would not let any racial animus or national origin animus affect their verdict." *Sanchez*, 692 F. Supp. 3d at 1034 (internal quotation marks omitted).

Thus, although my colleagues endeavor to discredit *Sarkisian*, it remains good law and we are bound to follow it. Further, *Peña-Rodriguez* does not hold that the presence of a racially biased juror during jury deliberations must be deemed presumptively prejudicial. Therefore, I respectfully dissent.

## IV.

Bad enough that the majority declines to follow *Sarkisian*, which is binding precedent. But, today's opinion poses a further grave threat to our jury system. Under the majority's reasoning, if at any point during trial, there is a whiff of juror racial bias, a new trial is mandated.

My colleagues correctly decline to hold that the presence of a racially biased juror, who is excused before the trial court accepts a verdict, constitutes structural error under *Dyer v. Calderon*. Maj. Op. at 41–42. Instead, my colleagues adopt the *Remmer* framework because "[i]t gives district courts flexibility to address a wide range of circumstances." Maj. Op. at 41. But what my colleagues fail to realize is that they have not created flexibility for trial courts, but a straitjacket.

Typically, this Court accords "substantial weight to the trial judge's conclusion as to the effect of alleged juror misconduct . . . [especially] if the trial court has conducted an evidentiary hearing." *Armstrong*, 909 F.2d at 1244 (quoting *United States v. Madrid*, 842 F.2d 1090, 1092 (9th Cir.), *cert. denied*, 488 U.S. 912 (1988)). This makes sense "[b]ecause it is the trial judge who views juror conduct firsthand." *United States v. Perez*, 658 F.2d 654, 663 (9th Cir. 1981). Therefore, it is the trial judge who is "in the best position to evaluate the jury's ability to deliberate." *United States v. Beard*, 161 F.3d 1190, 1194 (9th Cir. 1998)

(internal quotation marks and citation omitted). Here, the district court conducted "an extensive inquiry" into "the potential impact of Juror 5's expressly biased comments." Maj. Op. at 45. Such factual findings are entitled to substantial deference under the applicable abuse of discretion standard articulated by *United States v. Hinkson*, 585 F.3d 1247, 1261–62 (9th Cir. 2009) (en banc).

However, my colleagues conclude the district court's conclusions warrant no deference because its "inquiry did not fully account for the *possibility* that a juror heard one or more of Juror 5's biased comments but *subjectively perceived* the comment as innocuous." Maj. Op. at 45 (emphasis added). Further, although the jurors universally stated they could remain fair and impartial, my colleagues discredit these assessments because "at least two jurors heard biased comments but did not *subjectively perceive* them as biased." Maj. Op. at 50 (emphasis added).

The majority has created a "heads I win, tails you lose" test. During a questioning of jurors as to whether racially biased comments affected their impartiality, if jurors admit bias, a new trial is mandated. But, if jurors admit hearing racially biased comments, yet deny they have been affected, a new trial is mandated because those jurors may *possibly* have not been able to perceive *subjectively* the racial bias that has tainted them.

Prior to the majority's quite original fabrication of such a rule, trial courts had been advised that the Government could rebut the presumption of prejudice by "most obviously . . . seek[ing] evidence from the jurors themselves[.]" *Godoy v. Spearman*, 861 F.3d 956, 968 (9th Cir. 2017) (en banc). But as my colleagues have informed us, "a juror's good faith belief in his own impartiality is not

dispositive." Maj. Op. at 50 (quoting *Shapiro*, 669 F.2d at 601 (citing *Irvin v. Dowd*, 366 U.S. 717, 727–28 (1961)). However, the majority errs by instructing courts to ignore completely a juror's belief in his own impartiality. Instead, after being told by a juror that he did not perceive what he heard as a racially biased comment by a juror, the trial court is to conclude on its own whether the questioned juror was not sufficiently enlightened to appreciate the racial bias content of a statement. Next, although the judge determines the juror was not sufficiently enlightened to perceive the racial bias of the comment, the judge must determine whether the juror was nonetheless tainted thereby and is therefore ineligible to serve as a juror. This is wrong for two reasons.

First, whether to trust the juror's belief in his own impartiality depends on the facts of the particular case. Unlike in *Sanchez*, the facts in *Irvin* were egregious and quite unlike those in *Sanchez*. Hence, the broad statements in *Irvin* are not applicable here. In *Irvin*, petitioner sought a writ of habeas corpus claiming his conviction of murder and sentence of death in the Circuit Court of Gibson County, Indiana, violated his Fourteenth Amendment due process right to a fair trial. 366 U.S. at 718–19. The Supreme Court held that petitioner's conviction violated the Fourteenth Amendment because the jury that convicted him was not impartial. *Id.* at 727–28. The Supreme Court noted that "[t]wo-thirds of the jurors had an opinion [before trial] that petitioner was guilty and were familiar with the material facts and circumstances involved, including the fact that other murders were attributed to him, some going so far as to say that it would take evidence to overcome their belief." *Id.* at 728. Thus, the Supreme Court found that, although the jurors were sincere when they said they could be fair and

impartial, "[w]here so many, so many times, admitted prejudice, such a statement of impartiality can be given little weight." *Id.* In *Sanchez*, no juror stated any knowledge about the case or stated an opinion as to Sanchez's guilt before he or she was impaneled. Second, there are no accusations that any juror, outside of Juror 5, who was excused, expressed any racial animus. Third, no juror "admitted prejudice" as the Supreme Court found the *Irvin* jurors had.

My colleagues' distrust of jurors' statements of impartiality is also wrong because it amounts to a catch-22. If a juror admits to hearing a racially biased statement, the juror is tainted because he cannot claim to be free of its corrosive effect. Recall that every juror in Sanchez's case who heard the racially biased comment unequivocally said it did not affect his or her deliberations or verdict. Maj. Op. at 20–21. But if a juror claims he did not perceive the comment heard as racially biased, then why is he tainted? Maj. Op. at 45.

Although the basis of that taint is not explained by the majority, two possibilities exist. One, that the juror did not recognize the comment as racist because the juror hearing the comment is himself racist and approves of the comment. Fortunately, here the district court questioned each juror individually and was "very confident that the remaining jurors did not and would not let any racial animus or national origin animus affect their verdict." *Sanchez*, 692 F. Supp. 3d at 1034 (internal quotation marks omitted). Therefore, the only other possibility is that the juror is simply not sufficiently enlightened to understand the comment he heard was racist. But if so, the racist comment would not have had any effect on the juror's deliberations. No harm, no foul.

Consider what the district court did in Sanchez's case and then ask whether a district court could ever avoid a mistrial under the majority's test. The district court here conducted a thorough investigation into Juror 16's allegation that a juror made a racist comment and whether any juror heard any comment which might indicate some bias based upon race, ethnicity, or national origin. Maj. Op. at 6–20. When a juror averred in the negative, the court asked again to assure himself that the juror had not left anything unsaid. If, on the other hand, a juror answered that he or she had heard the racist remark or accusation of racism, the court asked if the remark or accusation affected the juror's deliberations or verdict in any way. **[16]** Every juror unequivocally said no. Despite every juror's unequivocal statement that he or she was not affected, the court asked several jurors if they were "confident" or had "any reservation about" their assessment of the comment or accusation's effect on the juror individually or other jurors. Every juror expressed no doubt.

What then was there left for the district court to do? According to my colleagues, the district court erred by not asking jurors about their assessments of the evidence because "Juror 5's racial bias may have tainted [Juror 5's] assessment of the evidence, and [Juror 5's] biased assessment may have influenced other jurors. In this manner, Juror 5's racial bias could have tainted other jurors' views even if they did not hear any of his expressly biased comments." Maj. Op. 44. But, this is sheer speculation.

---

[16] The district court asked Juror 25 only if hearing the racist remark about Mexicans affected Juror 25's verdict. But when the court asked whether the comment "affected other jurors' deliberations or their verdict," Juror 25 responded, "I just know that it didn't affect me in any way."

There was no evidence that Juror 5 ever expressed his views of the evidence to the other jurors.  And defense counsel never suggested this line of questioning to the district court.

Worse yet, the majority's suggested line of inquiry as to whether Juror 5 discussed the evidence during deliberations necessarily would ask what evidence was discussed during jury deliberations, how it was discussed, and by whom. Such questioning would run afoul of this Court's prohibition on courts "delv[ing] deeply into a juror's motivations" during jury deliberations so as not to "intrude on the secrecy of the jury's deliberations."  *United States v. Symington*, 195 F.3d 1080, 1086 (9th Cir. 1999) (quoting *United States v. Brown*, 823 F.2d 591, 596 (D.C. Cir. 1987)).    Such questioning is prohibited because it "invite[s] trial judges to second-guess and influence the work of the jury." *Id.* (quoting *United States v. Thomas*, 116 F.3d 606, 620 (2d Cir. 1997)).    However, the majority suggests just that. Rather than "steer clear of the jury's view of the evidence," the district court would have had to have asked each juror whether Juror 5 discussed the evidence, what was discussed, and whether that discussion affected the juror's judgment. *United States v. Litwin*, 972 F.3d 1155, 1175 (9th Cir. 2020). How the majority concludes this inquiry would not have impermissibly invaded the jury's deliberations is beyond me.

The majority also faults the district court for not asking all jurors who did not report hearing Juror 5 make any biased comment if they heard biased comments they took in jest. Maj. Op. at 48 n.24.  But, according to the majority's logic, would that not prove that the juror who recalled a racist remark that he took to be in jest must himself be racist?  Far from overcoming the *Remmer* presumption of prejudice, the majority's proposed questioning confirms only that a

mistrial must be declared whenever the trial judge learns of any juror racial bias.

The majority faults the Government for not suggesting additional questions but does not tell the Government what additional questions would have resolved the majority's concerns. Maj. Op. at 49. This lack of guidance makes it almost impossible for the Government ever to rebut the application of the *Remmer* presumption of prejudice. Therefore, ask yourself, what possible evidence can the Government adduce to rebut the presumption of prejudice beyond what was done at Sanchez's trial? Each juror had already stated that his or her ability to deliberate and verdict were not affected. But that is not enough under the majority's decision.

Would a recitation of the damning evidence of fraud in the defendant's preparation of tax returns be enough? Likely not, because recall Juror 5's racial bias may have tainted his assessment of the evidence, which then could have tainted the other jurors' views, regardless whether Juror 5 ever actually expressed any such assessment of the evidence. No matter how otherwise damning the fruit of the evidence of guilt, the tree itself has been poisoned. Under the majority's test, the Government would have to prove that even were it "possible" that a juror was unconsciously affected by the biased statements, that did not happen in this case. Is the Government to call expert witnesses to opine into the psychological makeup of each juror and then opine that as to each juror the statements had no prejudicial effect? Perhaps the Government must retain a scholar of so-called "implicit bias" who can testify about whether this malign phenomenon played a part in any of the jury's deliberations.

My colleagues are quick to criticize the district court's investigation but offer no guidance to trial courts on how to remedy its defects.  Instead, they offer a reminder that courts during *Remmer* hearings "can—and should—consider the constitutional and practical concerns discussed in *Peña-Rodriguez* when assessing whether the government has met its burden."  Maj. Op. at 42.  One slight problem with that suggestion: the Supreme Court in *Peña-Rodriguez* provided no guidance to courts as to "what procedures a trial court must follow when confronted with a motion for a new trial based on juror testimony of racial bias." *Peña-Rodriguez*, 580 U.S. at 228.  Except, that is, to question the jurors on the subject, which is precisely what the district court did in *Sanchez*.  Nor did the Supreme Court "decide the appropriate standard for determining when evidence of racial bias is sufficient to require that the verdict be set aside and a new trial be granted." *Id.*

## V.

Just what are the Government and a district court to do when evidence of a juror's racial bias emerges during jury deliberations?  A dutiful reader of the majority opinion will know that jurors themselves cannot be trusted to erase doubt that their judgment was affected because they might have failed to perceive *subjectively* comments as racist, perhaps because the jurors themselves are infected by ineradicable "implicit bias."  Under the majority's analysis, any investigation into allegations of racial bias will be plagued by doubt because racist remarks may have been made, gone unnoticed or considered to have been made in jest, and their corrosive effect left unchecked.  The outcome is inescapable:

the district court must declare a mistrial and the Government must accede to it.[17]

The petit jury, that most distinctive feature of Anglo-American legal systems, should not be undermined because of judges' belief that "implicit bias" has been ineluctably triggered by a lone racist comment. Rather than wreak havoc on our Nation's jury system, my colleagues would be better served by following the words of this Court to deal with situations where a trial court determines that juror misconduct did not prejudice a party:

> When a wise and experienced judge, who presided at the trial and observed the jury, comes to such a conclusion, it is not for us to upset it. The trial judge was in a better position than we are to determine whether what happened was prejudicial.

*Armstrong*, 909 F.2d at 1244 (quoting *United States v. Klee*, 494 F.2d 394, 396 (9th Cir.), *cert. denied*, 419 U.S. 835 (1974)).

For the grave damage today's opinion does to the jury system, I respectfully dissent.

---

[17] The majority's *per se* rule effectively requiring a mistrial is precisely what *Shapiro* stated should not be done. *Shapiro*, 669 F.2d at 603 ("We emphasize that we do not adopt a per se rule requiring that a mistrial be declared whenever jury taint originates from within the jury itself.").